William D. HURST, Plaintiff–Appellant,

v.

HUGHES TOOL COMPANY, Defendant–Appellee.

No. 78–3798.

United States Court of Appeals, Fifth Circuit.

Jan. 22, 1981.

Rehearing Denied Feb. 20, 1981.

Shuford, Jackson & Miller, Richard L. Jackson, Dallas, Tex., for plaintiff–appellant.

Robert A. Felsman, Fort Worth, Tex., Strasburger & Price, Patrick F. McGowan, Dallas, Tex., for defendant–appellee.

Before GODBOLD, SIMPSON and THOMAS A. CLARK, Circuit Judges.

SIMPSON, Circuit Judge:

The instant diversity case presents a problem in the law of trade secrets, which was disposed of by the district court on a motion for directed verdict in favor of defendant. We affirm.

■ The governing Texas law as to the use of another's trade secrets is well expressed in *E. I. duPont deNemours & Co., Inc. v. Christopher*, 431 F.2d 1012 (5th Cir. 1970) where we stated:

> The Texas Supreme Court specifically adopted the rule found in the Restatement of Torts which provides:
>
> > "One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if
> >
> > (a) he discovered the secret by improper means, or
> >
> > (b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him * * *."
>
> Restatement of Torts § 757 (1939).

*Id.* at 1014. The issues in this trade secrets case follow from the well settled law; namely, was the trial court correct in directing a verdict against the plaintiff on the issues of: (1) the existence of a trade secret, (2) the breach of a confidential relationship or the improper discovery of a trade secret, (3) the use of a trade secret, and (4) the award of appropriate damages.

### The Existence of a Trade Secret

To decide whether the trial court was correct in finding that there was insufficient evidence that Hurst's information was a trade secret deserving protection, two aspects of the problem must be examined: (1) what is the nature of the trade secret and (2) what are the facts surrounding the existence, discovery and use of the trade secret. First, Hurst alleges that the nature of the trade secret is, "that the use of boron coatings in wear surfaces and drill bits will make them more advantageous, accomplish certain benefits, along with the proof which he submitted to them that that concept in that trade secret is a viable, workable concept." Oral argument, statement of Mr. Jackson. *See* transcript at 110.

Second, the facts[1] surrounding the existence, discovery and use of the alleged trade secret are best approached chronologically. Hurst initially became interested in the concept of applying boron coatings to metal after reading an article in the August, 1969 issue of *Scientific American*. This magazine piece, written by Dr. Newell Cook, was on a metalliding process patented by General Electric. Transcript at 16–17. Dr. Cook, who was employed by General Electric's research and development department, was the inventor of the process discussed in the article. *Id.* at 19.

After reading this article, Hurst telephoned the author and asked him general questions concerning the process, its cost and its availability. *Id.* About this same time, Hurst, who was looking for an application for Dr. Cook's process, also had discussions with friends in the oil business, who complained of the high cost of removing and replacing worn drilling bits. Soon thereafter, Hurst conceived the idea of using a boron coating on the bearing and cutting surfaces of oil and gas well drill bits to give them longer life and to reduce fixed costs in the drilling business. *Id.* at 18–23. While doing this preliminary research, Hurst checked every source he could find and did not discover that boron had been applied to drill bits. *Id.* at 23.

After this initial research and development phase, Hurst bought a drill bit, had it dismantled and had the drill cones boronized inside and out as well as heat treated. *Id.* at 29–40. Hurst reassembled these drill bits and bought two untreated drill bits. He then supervised the digging of test drill sites, from which he generated comparison data showing that the boronized drill bits were superior to the untreated bits. *Id.* at 40–46. After the test sites were dug, Hurst had the treated bits cut apart and analyzed. *Id.* at 47–54. From the information gained, Hurst repeated and improved the process with other drill bits. *Id.* at 56. It appears from his testimony that Hurst spent between fifteen and twenty thousand dollars on this project. *Id.* at 110. It is also apparent that his experiments were thorough and workmanlike.

While Hurst was testing and prior to his initial visit to Hughes Tool Company on September 16, 1970, Hughes Tool had also been looking into the boronizing process. For some time prior to Hurst's visit, Hughes had considered boronizing some of its products and had initiated work on journal bearings. *Id.* at 292. Defendant's exhibits five and six are particularly interesting; they show that Hughes was asking as early as 1968 about metalliding and was receiving suggestions that boron would produce a hard surface on steel. Transcript at 297–304. Exhibit ten, another important exhibit, is a memo between personnel at Hughes indicating interest in having samples sent out to be boronized. Exhibit twenty is a report written by an employee of Hughes which referred to boronizing and said:

> I believe that metallided surfaces can be used for bearing, hard surfacing and cutting structure applications. The properties of a metallided surface such as high hardness, fatigue strength, and a low coefficient of friction could possibly improve our products. Metalliding might also provide these properties more cheaply than our present designs do.

*Id.* at 307–08.

The evidence summarized in the paragraphs above was found on directed verdict not to show the existence of a trade secret. The proper test for a directed verdict, which we think the trial court correctly applied, was stated in *Boeing v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969) (en banc):

> A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a

---

1. The facts as we state them herein are extracted largely from Hurst's testimony and in all instances are stated in the light most favorable to Hurst.

conflict in substantial evidence to create a jury question.

Considering this evidence and the record as a whole we affirm the trial court and find that there is no substantial conflict in the evidence sufficient to require sending this case to the jury on the question of the existence of a trade secret.

### The Breach of a Confidential Relationship or the Improper Discovery of a Trade Secret

■ Secondly, we find that there was not a breach of a confidential relationship by Hughes Tool nor was there an improper discovery of the Hurst information. On September 16, 1970, without an appointment, Hurst arrived at Hughes Tool Company with one of his cones and told the receptionist that he would like someone to look at it. Transcript at 92. From Hughes Tool Company records, it was established that Hurst talked with Mr. Wisler. *Id.* at 93. Hurst stated concerning his ten–minute conversation with Wisler:

I was brief as possible. I tried to give him a quick rundown on the cone, I told him it was–that it had a layer of boron on it. Gave him a few figures, hardness figures and such, asked if he'd be interested in testing it. He indicated he would.

*Id.* at 94. Neither during this meeting, nor in subsequent meetings so far as revealed by the record, did Hurst even suggest that the information he was giving to Hughes was to be considered confidential. *Id.*

Breach of a confidential relationship is different from an improper discovery of a trade secret. The *Christopher* case quoted at the beginning of this opinion is a clear example of the discovery of a trade secret by improper means. In *Christopher*, duPont was building a new plant and before it could get the roof over its highly secret new process for producing methanol, the Christophers took aerial photographs of the new construction. In *Christopher*, there was no confidential relationship; however, there was a discovery of a trade secret by stealthy and improper means. The *Christopher*

court stated that trade secret protection was not limited to a breach of a confidential relationship when the facts of the case raise the issue of some other wrongful conduct on the part of one discovering the trade secrets of another. *E. I. duPont deNemours & Co. v. Christopher, supra,* 431 F.2d at 1015.

Although neither case shows breach of a confidential relationship, the instant case differs from *Christopher*. After his initial meeting with Wisler, Hurst had several telephone conversations with representatives of Hughes Tool in which they asked numerous questions; some of which concerned boron densities, carburization techniques, boronization depths, hardness levels and other testing results. *Id.* at 102. In addition, Hurst, this time with an advance appointment, made a second trip to Houston to Hughes Tool. For his second visit, Hurst took all of his test results and notes with him. *Id.* at 104–05. Although Hughes Tool employees asked him more questions and asked to keep his cone, they refused to accept any of Hurst's test results and notes. *Id.* at 108. During this second meeting, Hurst did tell Hughes that he proposed, "some sort of sharing of royalty of some sort." *Id.* at 107. After this second trip to Houston, Hurst never heard from Hughes Tool again. The Hurst situation differs from *Christopher* in that Hughes Tool did not use stealth or improper means of discovery to get information from Hurst.

### The Use of the Trade Secret

■ After receiving Hurst's cone, it was sent to the Product Metallurgy Group at Hughes for testing. Transcript at 187. Prior to the testing of Hurst's cone, Hughes Tool had never done any actual testing of boronized cutting structures. *Id.* at 192. Therefore, six tests were ordered for the cone, among which were the boring mill test for wear resistance and a microscopic examination for structural properties of the treatment itself, a knoop hardness test and a test for carburization. *Id.* at 191–203. Upon completion of the testing, Mr. Prince, an employee of Hughes Tool, wrote a "clo-

sure" or closing memorandum in which it was stated:

> "The results of this testing has indicated that boronizing may be a way of improving the life and performance of the milled tooth cones. Further testing and evaluation will be necessary to determine how the cracking in the case will affect the performance of the cone and how the extremely hard surface will hold up under actual drilling conditions where all information obtained to this date indicates a cone with a 'soft skin' performs the best. These and other questions will have to be answered by other tests."

*Id.* at 236. The entire body of work done on Hurst's cone was classified as a sub–program by Hughes Tool. *Id.* at 239. According to Clyde Dill, the Director of Research for Hughes Tool Company, this sub–program was one of the bases for further testing. *Id.* at 242. The results gleaned gave Hughes Tool encouragement to go forward with other boronizing testing, which led to several Hughes Company patents for boronizing bearing surfaces and cutting structures. *Id.* at 253–54, 357–366.

In its brief, Hughes Tool asserts that it did not "use" Hurst's idea. Hughes points out that its patents do not prevent Hurst from boriding cones in the same manner as he has done in the past, i. e. hard facing and then boronizing. Brief of Appellees at 42, Transcript at 507. Furthermore, Hughes claims Hurst's process brought it nothing of value and states:

> it is impractical to boronize the *bearing* surface of a cutter because you have to carburize, boronize, harden and temper the cutter; if you do that, the bearing surface will be tapered out of round. Hughes would then have to grind it and boronize the surface so hard that only diamond grinding could be used, and that would remove the boronized case.

Brief of Appellee at 42–43. Nevertheless, Mr. Felsman, testifying for Hughes stated:

> The other patent relating to cones that was retained by Mr. Scales and Mr. Dill teach a substitution of his boronized treatment for the hard facing on the cones. The cone Mr. Hurst brought was a standard OWD Hughes cone and it had a lot of hard metal put on the teeth with a welding technique and real hard particles in the center, tungsten carbide, and then the boronizing treatment was applied over those things.
> The idea that Mr. Scales subsequently had was that possibly if you did the boronizing technique correctly you could do without all this hard facing requirement on those cones and so we obtained a patent for him on the idea of substituting this boronizing treatment for the hard facing treatment.

Transcript at 507.

Hughes Tool is presently boronizing journal bearing pins in certain models of its drill bits. Transcript at 262. The company does not now boronize cutting structures, although from the testimony concerning its patents, nothing prevents it from doing so.

Despite the excellent efforts of counsel for Hurst, the ultimate use of Hurst's information in this technical case is hard to pin–point. Regardless of its protestations to the contrary, it appears that Hughes Tool did "use" Hurst's information in the sense that the work it did on Hurst's cone provided background information which led to at least one company patent. Nevertheless, the cone and the information supplied by Hurst clearly were not the sole or even the primary source of data used in making the decision to boronize journal bearing pins or indeed to boronize or not to boronize any other structure. In sum, Hurst's information, while of some benefit provided only negative, "what not to do", input to Hughes.

Thus, we reach three conclusions concerning the complex factual situation before the district court. First, we affirm the finding of the district court that there was insufficient evidence of the existence of a trade secret to go to the jury. Second, we find no record evidence that Hurst took steps to protect himself, or that Hughes breached Hurst's confidentiality or that Hughes improperly discovered Hurst's information. Third, we find that the evidence that

Hughes did to some extent avail itself of the information supplied by Hurst is of no benefit to Hurst in establishing liability.

Since liability was not established, such damage as Hurst suffered may not be recompensed. We need not explore the question of the award of damages.

AFFIRMED.