TACO CABANA INTERNATIONAL, INC., Plaintiff–Appellee,

v.

TWO PESOS, INC., Defendant–Appellant.

No. 89–2203.

United States Court of Appeals, Fifth Circuit.

June 11, 1991.

this right by failing to raise this issue at the administrative level." Secretary's brief, p. 11.

Kimball J. Corson, Janet Napolitano, Lewis & Roca, Phoenix, Ariz., for defendant-appellant.

James B. Gambrell, Marc L. Delflache, Eugene R. Montalvo, Pravel, Gambrell, Hewitt, Kimball & Krieger, Houston, Tex., for plaintiff-appellee.

Before REAVLEY, GARWOOD, and BARKSDALE, Circuit Judges.

REAVLEY, Circuit Judge:

Taco Cabana complained of the imitation of the appearance and motif of its Mexican restaurants by Two Pesos. Taco Cabana won a judgment for trade dress infringement under the Lanham Act and misappropriation of trade secrets under Texas law. Two Pesos appeals, claiming that Taco Cabana's trade dress is not protectable because the Mexican motif is not protectable, and that Taco Cabana surrendered any claim it had to Lanham Act protection by cross-licensing with another restaurant and retaining the same trade dress for two different restaurant names. Two Pesos also claims that it obtained the alleged trade secrets—architectural plans and kitchen equipment layout—in a lawful manner and cannot be guilty as a matter of law

for trade secret misappropriation. We affirm.

## BACKGROUND

Two brothers, Felix and Mike Stehling, opened the first Taco Cabana restaurant in San Antonio in September 1978, and opened five more restaurants in San Antonio by 1985. Taco Cabana describes its Mexican fast-food trade dress as:

a festive eating atmosphere having interior dining and patio areas decorated with artifacts, bright colors, paintings and murals. The patio includes interior and exterior areas with the interior patio capable of being sealed off from the outside patio by overhead garage doors. The stepped exterior of the building is a festive and vivid color scheme using top border paint and neon stripes. Bright awnings and umbrellas continue the theme.

In December 1985, Marno McDermott and Jim Blacketer opened Two Pesos in Houston. Two Pesos adopted a motif essentially consistent with the above description of Taco Cabana's trade dress,[1] and expanded rapidly in Houston and other markets in and out of Texas,[2] but did not enter San Antonio. In 1987, Taco Cabana sued Two Pesos for trade dress infringement under section 43(a) of the Lanham Act and for theft of trade secrets under Texas common law.

Six days before filing suit against Two Pesos, the Stehling brothers entered into a series of agreements dividing the Taco Cabana restaurants between themselves and going their separate ways. Felix Stehling retained the "Taco Cabana" name, and Michael Stehling adopted the name "TaCasita." The agreements allowed the two groups to use the same trade dress, though one provision required "reasonable efforts to modify their trade dress for their respective future restaurants sufficiently to distinguish the restaurants of each Group from the restaurants of the other Group in

the public's mind." The Stehlings have not altered their respective trade dresses. After filing suit, Taco Cabana expanded into several cities, including Houston and Dallas where Two Pesos was already doing business.

The jury found that: (1) Taco Cabana has a trade dress; (2) Taco Cabana's dress, taken as a whole, is non-functional; (3) the dress is inherently distinctive; (4) the dress has not acquired secondary meaning in the Texas market; (5) customers might likely associate or confuse a Taco Cabana restaurant with a Two Pesos restaurant; (6) Taco Cabana exercises adequate supervision and control over TaCasita to ensure that the quality of TaCasita's goods and services are not inferior to Taco Cabana's; and (7) Taco Cabana was damaged by the trade dress infringement. The jury awarded $306,000 for lost profits, $628,300 for lost income, and $0 for loss of good will. The district court doubled the damages for trade dress infringement (bringing the total to $1,868,600), awarded attorneys fees of $937,550, and ordered Two Pesos to make several changes in its restaurant design.

Taco Cabana also claimed misappropriation of the following trade secrets: (1) certain architectural drawings; (2) its kitchen equipment layout and design; and (3) its kitchen and restaurant operating procedures. The jury found that Two Pesos misappropriated the architectural drawings and the kitchen equipment layout and design, but not the operating procedures. The jury awarded $150,000 for the misappropriation. The district court entered judgment on the jury's verdict, and denied Two Pesos' motions for judgment n.o.v. and for a new trial. Two Pesos appeals.

## DISCUSSION

### I. *Trade Dress Infringement*

■■ Trade dress infringement is established by showing that: (1) the dress

---

1. Phil Romano, a restauranteur since 1965 who developed the successful Fuddruckers chain, testified that Taco Cabana and Two Pesos are "shaped the same. They look the same. When you're inside they feel the same. They have the same product."

2. Between December 1985 and August 1988, Two Pesos opened 29 restaurants.

qualifies for protection, which requires considering functionality, distinctiveness, and secondary meaning; and (2) that the dress has been infringed, which requires considering the likelihood of confusion. *Sicilia Di R. Biebow & Co. v. Cox,* 732 F.2d 417, 425 (5th Cir.1984).

## A. The Threshold "Concept" Dispute.

The district court instructed the jury that:

"trade dress" is the total image of the business. Taco Cabana's trade dress may include the shape and general appearance of the exterior of the restaurant, the identifying sign, the interior kitchen floor plan, the decor, the menu, the equipment used to serve food, the servers' uniform and other features reflecting the total image of the restaurant.

*See Blue Bell Bio–Medical v. Cin–Bad, Inc.,* 864 F.2d 1253, 1256 (5th Cir.1989) ("The 'trade dress' of a product is essentially its total image and overall appearance.").

Two Pesos argues that protectable trade dress is much narrower than "total image." The combined effect, Two Pesos argues, of Taco Cabana's consistent reference to "concept" and the district court's "total image" instruction was to mislead the jury into believing that Taco Cabana had a right to preclude competitors from using a Mexican theme for a Mexican restaurant.[3] Taco Cabana cannot preclude Two Pesos or any-

one from entering the upscale Mexican fast-food market. But the jury was not misled into protecting such an abstract level of Taco Cabana's trade dress.

A competitor can use elements of Taco Cabana's trade dress,[4] but Taco Cabana "can protect a combination of visual elements 'that, taken together, ... may create a distinctive visual impression.'" *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 842–43 (9th Cir.1987), *quoting Falcon Rice Mill v. Community Rice Mill,* 725 F.2d 336, 346 (5th Cir.1984). Two Pesos may enter the upscale Mexican fast-food market, but it may not copy Taco Cabana's distinctive combination of layout and design features.[5] Two Pesos' imitation reflects not merely components of Taco Cabana's trade dress, but its distinctive integration of components. The instructions properly cautioned the jury not to focus on isolated components in determining the protectability of Taco Cabana's trade dress, but rather to consider the overall combination of elements.

## B. The Elements of Protectability.

### 1. *Functionality.*

The portions of the trial court's instructions disputed by Two Pesos appear in bold type:

The law allows the copying of functional features in the public interest of enhancing competition....

---

**3.** *See Prufrock Ltd., Inc. v. Lasater,* 781 F.2d 129, 132 (8th Cir.1986) ("[T]he district court committed error by including Prufrock's core concept in its definition of Prufrock's trade dress. Prufrock simply cannot preclude [defendant] from entering the 'down home country cooking' restaurant business.").

**4.** *See Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695, 703 (5th Cir. Unit A 1981) (protecting "combination of particular hues of [plaintiff's] colors, arranged in certain geometric designs, presented in conjunction with a particular style of printing ... would leave innumerable other combinations of the same colors ..."), *cert. denied,* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982); *cf. No Nonsense Fashions, Inc. v. Consolidated Foods Corp.,* 226 U.S.P.Q. 502 (T.T.A.B. 1985) ("Sheer Elegance" for pantyhose is a suggestive mark, and registration will not prevent competitors

from descriptive use of "sheer," "elegant," or "elegance"). *But see AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1537 (11th Cir.1986) (noting exception to general rule of totality when third party use of one or more elements of plaintiff's trade dress is so extensive and so similar to plaintiff's that it impairs ability of consumers to identify source), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987).

**5.** Two Pesos' own Franchise Agreement assumes the protectability of essentially that which it here asserts cannot be protected. That agreement defines trade dress as follows:

Franchisor employs certain distinctive and identifying restaurant layout and design features, including distinctive building design, decor, accessories and fixtures and other identifying trade dress in the interior and exterior of its Restaurants, which features ... are collectively referred to herein as "Trade Dress."

Even if the trade dress is made up of individual elements, **some of which serve a functional purpose,** the trade dress may be protectable so long as the combination of these individual elements which define Taco Cabana's trade dress taken is arbitrary. On the other hand, if you find that Taco Cabana's trade dress taken as a whole **must be used by others in order to compete** in the Mexican fast-food restaurant business, then you should find that Plaintiff's trade dress is functional and not protectable.

[T]he inquiry into whether Taco Cabana's trade dress is functional or non-functional **should not be addressed to whether individual elements fall within the definition, but whether the whole collection of elements taken together are functional or non-functional.**

■ Two Pesos' argument reduces to a fallacious syllogism: (1) functional elements do not enjoy protection; (2) Taco Cabana's trade dress includes functional elements; (3) therefore Taco Cabana's trade dress does not enjoy protection. Two Pesos correctly emphasizes that functional features cannot be protected, *Sno–Wizard Mfg., Inc. v. Eisemann Products Co.,* 791 F.2d 423, 425 n. 2 (5th Cir.1986), but a particular arbitrary combination of functional features, the combination of which is not itself functional, properly enjoys protection. *See Sicilia,* 732 F.2d at 425 (design may be distinctive and identifying even though also related to performing a function); *Chemlawn Services Corp. v. GNC Pumps, Inc.,* 690 F.Supp. 1560, 1571 (S.D.Tex.1988) (exterior configuration of functional parts arbitrarily selected; not necessary to copy configuration of each part to effectuate functions). Taco Cabana does not seek protection for individual elements, but for a particular combination of elements which constitute trade dress as a whole. *See Sicilia,* 732 F.2d at 429.

With the doctrine of functionality, the law secures for the marketplace a latitude of competitive alternatives. *See Freddie Fuddruckers, Inc. v. Ridgeline, Inc.,* 589 F.Supp. 72, 77 (N.D.Tex.1984) (policy predicate for functionality doctrine is public interest in enhancing competition), *aff'd without op.,* 783 F.2d 1062 (5th Cir.1986); *Stormy Clime Ltd. v. ProGroup, Inc.,* 809 F.2d 971, 977–78 (2d Cir.1987) (functionality test critical to avoid upsetting patent law by indefinitely extending trade dress protection to an aggregation of elements that would otherwise enrich the public domain after expiration of design patent). "The need to avoid monopolization of a design lessens, however, in the area of distinctive trade dress. The wide range of available packaging and design options allows a producer to appropriate a distinctive identity without unduly hindering his competitors' ability to compete." *Sicilia,* 732 F.2d at 426 n. 7. Taco Cabana's particular integration of elements leaves a multitude of alternatives to the upscale Mexican fast-food industry that would not prove confusingly similar to Taco Cabana's trade dress.

■ Though the district court may have overstated the law to instruct the jury that protection is denied where the particular combination *"must* be used by others in order to compete," [6] under this record the instruction did not mislead the jury or prejudice Two Pesos. *See Smith v. Borg–Warner Corp.,* 626 F.2d 384, 387 (5th Cir.1980) ("tolerably accurate, albeit incomplete, statement of the law" did not constitute reversible error where instruction, "viewed in its worst light, merely gave plaintiff an instruction on an issue for which there was no evidence"). The jury heard substantial evidence of alternative combinations that could be used to compete effectively, and the record contains ample evidence that Taco Cabana's trade dress is, taken as a whole, nonfunctional.

2. *Inherent Distinctiveness & Secondary Meaning.*

■ "If a mark or dress serves as a symbol of origin it is considered distinctive or one of a few superior designs available.'" *Sicilia,* 732 F.2d at 427 (emphasis added), quoting *In re Morton–Norwich Products, Inc.,* 671 F.2d 1332, 1341 (C.C.P.A. 1982).

6. It should suffice for a finding of functionality if protecting the trade dress threatens to eliminate a substantial swath of competitive alternatives in the relevant market. "A design would be considered de jure functional if it is 'the best

and protectable. Unless a mark or dress is deemed 'inherently' or 'sufficiently' distinctive, however, secondary meaning must be established." *Sno–Wizard*, 791 F.2d at 425 n. 2.[7] Arguing that simply "distinctive" trade dress is not enough, Two Pesos cites error in the district court's failure to address the quality of *inherence.* We find no reversible error.

■ The district court instructed the jury as follows:

> Distinctiveness is a term used to indicate that a trade dress serves as a symbol of origin. If it is shown, by a preponderance of the evidence, that Taco Cabana's trade dress distinguishes its products and services from those of other restaurants and is not descriptive and not functional, then you should find that Taco Cabana's trade dress is inherently distinctive.

While the district court might have achieved greater semantic clarity by separately addressing distinctiveness and *inherent* distinctiveness, the instruction as a whole properly guided the jury as to the elements of inherent distinctiveness. A distinctive trade dress that is neither descriptive nor functional is *ipso facto* inherently distinctive.[8]

■ Two Pesos argues that Taco Cabana's trade dress embodies descriptive elements, which should disqualify the dress for inherent distinctiveness. "A *descriptive* term 'identifies a characteristic or quality of an article or service' ... such as its color, odor, function, dimensions, or ingredients." *Zatarains Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790 (5th Cir.1983) (finding "Fish–Fri" descriptive and not protectable), quoting *Vision Center v. Opticks, Inc.*, 596 F.2d 111, 115 (5th Cir.1979), *cert. denied*, 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980).

Taco Cabana's trade dress does not surrender the possibility of inherent distinctiveness merely by embodying certain descriptive elements. As with Two Pesos' flawed syllogism on functional elements, the existence of descriptive elements does not eliminate the possibility of inherent distinctiveness in the trade dress as a whole. "The whole, in trademark law, is often greater than the sum of its parts." *Association of Co-operative Members, Inc. v. Farmland Indus., Inc.*, 684 F.2d 1134, 1140 (5th Cir.1982), *cert. denied*, 460 U.S. 1038, 103 S.Ct. 1428, 75 L.Ed.2d 788 (1983); *see also* 1 J. McCarthy, TRADEMARKS AND UNFAIR COMPETITION § 11:10 at 457 (2d ed. 1984) ("combination of two or more admittedly descriptive elements as a composite mark may result in a composite which is non-descriptive"; and quoting *Farmland Industries, supra* ). Again, competitors may use individual elements in Taco Cabana's trade dress, but the law protects the distinctive totality. The jury visited both Taco Cabana and Two Pesos, and heard ample evidence of the distinctiveness of

---

7. Two Pesos' argument—that the jury finding of inherent distinctiveness contradicts its finding of no secondary meaning in the Texas market—ignores the law in this circuit. While the necessarily imperfect (and often prohibitively difficult) methods for assessing secondary meaning address the empirical question of current consumer association, the legal recognition of an inherently distinctive trademark or trade dress acknowledges the owner's legitimate proprietary interest in its unique and valuable informational device, regardless of whether substantial consumer association yet bestows the additional empirical protection of secondary meaning.

8. As no one contends that Taco Cabana's trade dress is generic, the jury finding that the trade dress is not merely descriptive means that the dress is arbitrary, fanciful, or suggestive. We need not determine which of these three categories properly characterizes the trade dress, be-

cause all three entitle Taco Cabana to protection without proof of secondary meaning. A *weak* suggestive trade dress might narrow the *scope* of protection to competitors in the same product line, *see P.F. Cosmetique, S.A. v. Minnetonka Inc.*, 605 F.Supp. 662, 668–69 (S.D.N.Y.1985) (suggestive packaging, coupled with wide use of elements, is "weak mark," and thus protected against infringement only by competing products), but Taco Cabana and Two Pesos directly compete in the Mexican restaurant market, and Two Pesos' trade dress infringement therefore warrants redress even if Taco Cabana's trade dress is merely suggestive and weak. *See Sun Banks of Fla. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 315 (5th Cir.1981) ("Although less distinctive than a fictitious, arbitrary or fanciful mark and therefore a comparatively weak mark, a suggestive mark will be protected without proof of secondary meaning.").

Taco Cabana's total trade dress, including the impressions of individuals responsible for the ultimate look of Two Pesos, who were sufficiently impressed with the distinctiveness of Taco Cabana's trade dress to replicate it. Given its rather brazen appropriation of Taco Cabana's distinctive combination, Two Pesos cannot escape accountability for unfair competition simply by pointing to particular elements it might have fairly employed for its own trade dress.

### C. The Legal Effect of the Cross–License.

■ Prior to this litigation, the Stehling brothers divided the Taco Cabana restaurants. Felix Stehling retained the name "Taco Cabana," and Michael Stehling adopted the name "TaCasita." The agreement allowed the two groups to use the same trade dress, which Two Pesos calls a "naked license." But Two Pesos faces a stringent standard because finding a "naked license" signals involuntary trademark abandonment and forfeits protection. *See American Foods, Inc. v. Golden Flake, Inc.*, 312 F.2d 619, 624–25 (5th Cir. 1963). While this cross-license arrangement is not governed closely by any precedent, we find no basis for an involuntary abandonment.

■ An owner may license its trademark or trade dress and retain proprietary rights if the owner maintains adequate control over the quality of goods and services that the licensee sells with the mark or dress. *See Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387 (5th Cir.1977) (quality-control rationale is that public has right to expect consistent quality of goods or services associated with trademark or trade dress). Two Pesos argues that the cross-license creates two separate sources of good will and thus cannot indicate a single origin. This argument ignores the emergence of the "quality theory," which broadens the older source theory "to include not only manufacturing source but also the source of the standards of quality of goods bearing the mark" or dress. 1 J. McCarthy, *supra*, § 3:4 at 112. So long as customers entering a Taco Cabana or a TaCasita can expect a consistent level of quality, the trade dress retains its "utility as an informational device." *Kentucky Fried*, 549 F.2d at 387.

While the parties dispute the actual level of quality control, the jury's finding—that Taco Cabana exercises adequate supervision and control over TaCasita to ensure that the quality of TaCasita's goods and services are not inferior to Taco Cabana's—enjoys adequate record support. We also reject Two Pesos' argument that the district court erred in refusing to instruct the jury that TaCasita must also exercise quality control over Taco Cabana. Ignoring the record evidence of at least some bilateral quality monitoring, the law requires consistent quality, not equivalent policing. The jury found the requisite quality consistency; we need not demand rigorous bilateral regulation.

■ The purpose of the quality-control requirement is to prevent the public deception that would ensue from variant quality standards under the same mark or dress. Where the particular circumstances of the licensing arrangement persuade us that the public will not be deceived, we need not elevate form over substance and require the same policing rigor appropriate to more formal licensing and franchising transactions. Where the license parties have engaged in a close working relationship, and may justifiably rely on each parties' intimacy with standards and procedures to ensure consistent quality, and no actual decline in quality standards is demonstrated, we would depart from the purpose of the law to find an abandonment simply for want of all the inspection and control formalities. *See Embedded Moments, Inc. v. International Silver Co.*, 648 F.Supp. 187, 194 (E.D.N.Y.1986) (license agreement without explicit provision for supervisory control and absence of actual inspection nevertheless no basis for abandonment where prior working relationship established basis for reliance on licensee's integrity and history of manufacture was "trouble-free").

The history of the Stehling brothers' relationship warrants this relaxation of for-

malities. Prior to the licensing agreement at issue, the Stehling brothers operated Taco Cabana together for approximately eight years. Taco Cabana and TaCasita do not use significantly different procedures or products, and the brothers may be expected to draw on their mutual experience to maintain the requisite quality consistency. They cannot protect their trade dress if they operate their separate restaurants in ignorance of each other's operations, but they need not maintain the careful policing appropriate to more formal license arrangements. Two Pesos adduces no evidence to indicate any decline in the level of quality at Taco Cabana or TaCasita, and we find nothing in the record to substantiate Two Pesos' claim that the licensing arrangement diminishes any proprietary rights in the trade dress.

### D. Likelihood of Confusion.

 The district court properly instructed the jury on the likelihood of confusion,[9] the jury found for Taco Cabana on this issue, and we find no reversible error.

Ignoring the indicia of confusion that yield unfavorable answers, Two Pesos expends considerable energy assaulting the Gelb Survey offered by Taco Cabana. That survey asked customers: (1) if they had ever been to a TaCasita or Taco Cabana or Two Pesos restaurant; (2) if yes, which ones; (3) "Do you think that any of these stores are owned or operated by the same company?" and (4) if so, "Why do you say that?" Questions 3 and 4 simply and objectively address the issue in this litigation. Subject to cross-examination and the other tools of the adversarial system, the jury could properly consider Mr. Gelb's conclusion that a substantial population of those who patronize quick-service Mexican restaurants, particularly those who have patronized Taco Cabana (where the survey was conducted), are likely to believe that Taco Cabana and Two Pesos are owned or operated by the same company.

The Peterson survey offered by Two Pesos is less helpful. That survey asked all respondents why they patronize Two Pesos. The survey then asked half of the respondents, "have you ever gone to another restaurant by mistake when you intended to go to a Two Pesos restaurant?" The other half were asked, "have you ever gone to a Two Pesos restaurant by mistake when you intended to go to another restaurant?" Predictably, a statistically insignificant number of people confessed to what would appear to be a rather silly mistake.[10] The issue is not whether consumers can read signs and menus that identify different restaurants, but whether consumers assume some affiliation between Taco Cabana and Two Pesos.

Surveys present evidence of actual confusion, which does not exhaust the confusion indicia. The other indicia considerably strengthen the basis for the jury finding: the similarity of the trade dress; the coincidence of products, markets, and advertising media; and Two Pesos' intent in adopting its trade dress.[11] For self-evident rea-

---

**9.** The indicia of confusion in the Fifth Circuit, as the district court correctly instructed, include: (a) the type of trade dress at issue; (b) the similarity between the trade dresses; (c) the similarity of products or services provided; (d) whether the plaintiff and defendant were in market competition for the same customers; (e) whether the plaintiff and defendant were likely to use the same advertising media; (f) defendant's intent in its adoption of its restaurant trade dress; and (g) instances of actual confusion. *Roto–Rooter Corp. v. O'Neal,* 513 F.2d 44, 45 (5th Cir.1975). No single factor is necessarily dispositive. *Falcon Rice,* 725 F.2d at 345 n. 9. Proof of actual confusion is not necessary. *Roto–Rooter,* 513 F.2d at 45–46.

**10.** Seeking thoroughness, the surveyors called twelve of the individuals who did so confess to find out more about the nature of their "mistake." Peterson testified during direct examination that the specific responses demonstrated even less likelihood of confusion between Two Pesos and Taco Cabana, because, for example, one person said he had taken a wrong turn, drove into the wrong parking lot, and ended up at Two Pesos "by mistake." Thus even the few so-called mistakes, in Peterson's gloss, turned out to have nothing to do with trade dress. Such responses, far from demonstrating anything relevant about trade dress confusion, instead suggest that people did not understand what the question meant by "mistake."

**11.** *See Sno–Wizard,* 791 F.2d at 428 (intent alone may be enough to support finding of likelihood of confusion).

sons, Two Pesos discusses none of these factors with the vigor of its survey arguments.

Finally, Two Pesos again attacks the cross-license arrangement, arguing essentially that Two Pesos is not accountable for confusion in a market already subject to the confusion perpetuated by Taco Cabana and TaCasita. But a consumer who assumes some affiliation between Taco Cabana and TaCasita assumes correctly and therefore suffers no "confusion."[12] An equivalent assumption about Two Pesos, however, is incorrect, and properly indicative of the market confusion for which the Lanham Act provides redress.

■ We therefore affirm the trial court's judgment that Two Pesos' appropriation of Taco Cabana's protectable trade dress creates a likelihood of confusion between unrelated entities, and thereby constitutes unfair competition.

## II. *Trade Secret Misappropriation*

The jury found that Taco Cabana's architectural plans and kitchen equipment layout and design—but not its kitchen and restaurant operating procedures—constitute trade secrets, and that Two Pesos misappropriated these secrets. The jury awarded $150,000 for the misappropriation.

■ A trade secret misappropriation in Texas requires: (a) the existence of a trade secret; (b) a breach of a confidential relationship or improper discovery of the trade secret; (c) use of the trade secret; and (d) damages. *Hurst v. Hughes Tool Co.*, 634 F.2d 895, 896 (5th Cir.), *cert. denied*, 454 U.S. 829, 102 S.Ct. 123, 70 L.Ed.2d 105 (1981). A trade secret is any formula, pattern, device or compilation of information used in one's business, and which gives an opportunity to obtain an advantage over competitors who do not know or use it. *Hyde Corp. v. Huffines*, 158 Tex. 566, 586, 314 S.W.2d 763, 776 (adopting RESTATEMENT OF TORTS § 757 (1939)), *cert. denied*, 358 U.S. 898, 79 S.Ct. 223, 3 L.Ed.2d 148 (1958).

■ Architectural plans and kitchen layout and design drawings may be trade secrets.[13] *See, e.g., American Precision Vibrator Co. v. National Air Vibrator Co.*, 764 S.W.2d 274, 278 (Tex.App.—Houston [1st Dist.] 1988, no writ) (blueprints, drawings, and customer lists constitute trade secrets); *Weed Eater, Inc. v. Dowling*, 562 S.W.2d 898, 901–02 (Tex.Civ.App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.) (drawings of assembly-line layout and design entitled to trade secret protection); *Ecolaire Inc. v. Crissman*, 542 F.Supp. 196, 206 (E.D.Pa.1982) (drawings, blueprints, and lists constitute trade secrets because such information could be obtained, through other than improper means, only with difficulty and delay).

■ The issue thus becomes whether sufficient and continuous secrecy attached to these particular plans and drawings to preserve their status as trade secrets.

The owner of the secret must do something to protect himself. He will lose his secret by its disclosure unless it is done in some manner by which he creates a duty and places it on the other party not to further disclose or use it in violation of that duty.

*Furr's, Inc. v. United Specialty Advertising Co.*, 385 S.W.2d 456, 459 (Tex.Civ.App.—El Paso 1964, writ ref'd n.r.e.), *cert. denied*, 382 U.S. 824, 86 S.Ct. 59, 15 L.Ed.2d

---

**12.** Two Pesos promotes the applicability of *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 705–06 (2d Cir.1970) (plaintiff and defendant could not jointly or concurrently use Zeiss trademark because both companies directly competitive, sold same products, used same or very similar marks, marketed in many of the same areas and in the same manner, and there was actual confusion), *cert. denied*, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971). But in *Carl Zeiss*, the plaintiff asserted *exclusive* rights to a trademark. There was no consideration of an amicable licensing arrangement. We would

confront the persuasive force of this precedent if, for example, Taco Cabana or TaCasita petitioned the court to resolve a claim of exclusive right to the trade dress.

**13.** Two Pesos denies the confidential status of the architectural plans and kitchen design, but significantly defines licensed "confidential information" in its own franchise agreement to include "drawings, materials, equipment, specifications, techniques" and so forth.

71 (1965); *see also Carson Products Co. v. Califano*, 594 F.2d 453, 461 (5th Cir.1979) (however strong other indicia of trade secret status may be, subject matter must be secret, such that acquiring information would be difficult except by improper means).

The jury concluded that Two Pesos had misappropriated Taco Cabana's trade secrets, and we must review that conclusion constrained by our generous deference to jury findings. Under a less deferential standard of review, our decision might differ, but considering the evidence "in the light and with all reasonable inferences most favorable" to Taco Cabana, we cannot say that "the facts and inferences point so strongly and overwhelmingly in favor of [Two Pesos] that the Court believes that reasonable [persons] could not arrive at a contrary verdict." *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (en banc), *cited in Molex Inc. v. Nolen*, 759 F.2d 474, 478–79 (5th Cir.1985) (trade-secret jury trial).

The jury could reasonably view the disclosures adduced by Two Pesos as limited and therefore insufficient to extinguish the secrecy of the materials. If a voluntary disclosure occurs in a context that would not ordinarily occasion public exposure, and in a manner that does not carelessly exceed the imperatives of a beneficial transaction, then the disclosure is properly limited and the requisite secrecy retained. *Metallurgical Industries Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1200 (5th Cir.1986) (finding no surrender of secrecy where disclosures were not public announcements and secrets divulged only to businesses with whom plaintiff dealt with expectation of profit). Thus the disclosure of Taco Cabana plans to contractors did not extinguish their secrecy.[14]

 Similarly, only a limited disclosure was shown by the fact that a paralegal for Two Pesos' trial counsel obtained the architectural plans from a municipality under the Texas Open Records Act, TEX.REV.CIV. STAT.ANN. art. 6252–17a (Vernon Supp. 1991).[15] The fact that Taco Cabana was required to file the plans to obtain a building permit does not eviscerate its legitimate proprietary rights.[16] *Cf. Ashworth v. Glover*, 20 Utah 2d 85, 89–90, 433 P.2d 315, 319 (1967) (architect suing for conversion of restaurant construction plans did not surrender common law proprietary rights in plans by distributing copies to contractors or by filing copy with city). The district court correctly instructed the jury that "[f]iling of architectural plans with a city does not make them public information within the context of secrecy that relates to the law of trade secrets." [17]

---

**14.** *See also International Election Systems Corp. v. Shoup*, 452 F.Supp. 684, 707–08 (E.D.Pa.1978) (technical drawings and blueprints qualified as trade secrets despite their unrestricted transfer to certain companies and employees' free access to such records), *aff'd without op.*, 595 F.2d 1212 (3d Cir.1979); *cf. Nucor Corp. v. Tennessee Forging Steel Service, Inc.*, 476 F.2d 386, 390 (8th Cir.1973) (distribution of plans to potential contractors and subcontractors, even though not marked confidential and not required to be returned, does not constitute general publication for purposes of common law copyright).

**15.** Section 3(a)(10) creates an exception to disclosure for "trade secrets and commercial or financial information obtained from a person and privileged or confidential by statute or judicial decision." *See, e.g.,* Tex. Att'y Gen. ORD–554 (1990) (semiconductor manufacturer with verified interest in secrecy stated valid trade secret exemption for plant design and layout).

**16.** The paralegal obtained the plans in August of 1987 by telling the city clerk of Leon Valley that

she needed copies for a lawsuit. Blacketer testified that he obtained a set of Taco Cabana architectural drawings from Kaplan over two years earlier in April of 1985. Thus the acquisition from Leon Valley, even if lawful, does not bear on the outcome of this case. "The fact that a trade secret is of such a nature that it can be discovered by experimentation or other fair and lawful means does not deprive its owner of the right to protection from those who would secure possession of it by unfair means." *Weed Eater*, 562 S.W.2d at 901.

**17.** Given the inevitable conflict between public and private information under laws that vigorously and necessarily champion both, we do not intend herein to signal a significant shift in either direction. The delicate balance remains undisturbed. But if the wide public dissemination we prize disgorges properly confidential information, we need not thereafter baptize its unfair exploitation. We neither alter nor add to either body of law to recognize that bare availability of information does not end the fact-sen-

Joseph Friesenhahn, Felix Stehling's former partner, was a prospective associate in the Two Pesos venture until McDermott and Blacketer decided to go forward without his services. Friesenhahn testified in his deposition that McDermott (one of Two Pesos' founders) offered him $25,000 for a set of the plans. McDermott fervently denied making this offer, and Friesenhahn's deposition testimony did flip-flop on this issue because of a peculiar memory lapse in the first deposition. But it is the jury's province to determine weight and credibility. "Secrecy is a relative term. The information may be known to several persons and yet still be secret if third parties would be willing to pay for a breach of trust in order to ascertain it." *A.H. Emery Co. v. Marcan Products Corp.*, 268 F.Supp. 289, 299 (S.D.N.Y.1967) (holding that drawings and blueprints of a machine are trade secrets), *aff'd*, 389 F.2d 11 (2d Cir.), *cert. denied*, 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968).

The jury heard further that upon failing the Friesenhahn ploy, McDermott and Blacketer obtained a set of the plans from Joe Kaplan, a lighting designer. Kaplan testified in his deposition that he had borrowed a set of plans from Rene DeBacker, an electrical estimator for Vollmer Electrical Company. Kaplan said he wanted to study the plans and recommend better lighting arrangements, though he later admitted that he never looked at the plans. He copied the plans without telling anyone, and the next day "brought the [original] plans back and put them back on the table where [he] found them."

DeBacker testified that he considers such plans confidential, that he would always consult Vollmer before considering a request for copies of plans, and that neither Kaplan nor anyone else ever asked

him for a set of the plans. Ferdinand Vollmer likewise testified that his company treats all architectural plans as proprietary and confidential, that Kaplan never asked him for a set of Taco Cabana plans, that he would not have given him a set even had Kaplan asked, and that he thinks Kaplan stole the plans.

We need not detail the various reasonable inferences—some subtle and some unsavory—to acknowledge that one view of the evidence would not inculpate Two Pesos; another view would. The jury properly assumed its function of assigning weight and credibility to the various accusations and denials, of which the foregoing is a representative glimpse. The jury's conclusion rests on adequate evidence, and we decline to disturb the verdict.

 Finally, Two Pesos does not seriously dispute that it used the plans, and ample evidence supports this conclusion.

### III. *Remedies*

The jury awarded $306,000 for lost profits, $628,300 for lost income, and nothing for loss of good will. For the trade secret misappropriation, the jury awarded $150,000.[18] Finding intentional and deliberate infringement, the district court doubled the damages to $1,868,600 for the trade dress infringement, and awarded attorneys' fees of $937,550. The court further ordered Two Pesos to make several changes in the design of its Texas restaurants, and to dispel customer confusion by displaying a prominent sign for a year acknowledging that Two Pesos had unfairly copied Taco Cabana's restaurant concept.

Taco Cabana claims injury, under the so-called "headstart" theory, from Two Pesos' preemption of the Houston market and other areas. According to Two Pesos, the

---

sitive inquiry into whether it was nevertheless misappropriated. *Cf. Edgar H. Wood Associates, Inc. v. Skene*, 347 Mass. 351, 363, 197 N.E.2d 886, 894 (1964) ("It is not the purpose of the filing requirement to facilitate and permit architectural plagiarism, or enable one to obtain free of charge the benefit of another's work and thus to reap where it has not sown.").

18. In its jury instructions on damages, the district court carefully addressed the separate elements of damages—the value of the trade secret, and the loss of profits, income, and good will from the trade dress infringement—but without indicating that these categories could overlap. Two Pesos thoroughly briefed the issue of damages, but raised no point of error as to possible duplication in the award, and we do not address it.

jury based damages on an initial franchise fee of $10,000 per store and continuing royalty of 1% (which is substantially below what Taco Cabana or Two Pesos requires of actual franchisees). The lost profits calculation apparently assumes a foreclosure of five restaurants in the Houston area at a 6% profit margin on sales of $1.7 million per store with an incremental fixed overhead of $204,000. The jury heard abundant evidence on the foregoing remedies, including detailed damage models yielding totals substantially exceeding the jury's award.

**A. Trade–Dress Infringement Remedies.**

■■ Circuits that have addressed the issue uniformly apply the Lanham Act remedies of section 35 to violations of section 43(a). *See NuPulse, Inc. v. Schlueter Co.,* 853 F.2d 545, 548, 550 (7th Cir.1988) (citing cases).[19] Section 35 provides that a prevailing plaintiff may,

> subject to the principles of equity ... recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.... In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. Such sum ... shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C.A. § 1117(a) (West Supp.1991). Taco Cabana's recovery may include "the economic benefits they normally would have received by licensing." *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.,* 597 F.2d 71, 75 (5th Cir.1979).

**B. Injunctive Relief.**

■■ Two Pesos weakly contests the requirements of structural changes and corrective advertising, calling them punitive instead of compensatory. "In fashioning relief against a party who has transgressed the governing legal standards, a court of equity is free to proscribe activities that, standing alone, would have been unassailable." *Kentucky Fried,* 549 F.2d at 390; *see also Chevron,* 659 F.2d at 705 (defendant required to distance itself from plaintiff's trade dress, even if requirement involves a competitive handicap not suffered by others); *Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.,* 670 F.2d 642, 650–51 (6th Cir.) (affirming district court's requirement of corrective advertising), *cert. denied,* 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982).

**C. Profits and Damages.**

■■ Two Pesos argues that a monetary award requires evidence of actual confusion, and that only diverted sales provide a proper measure of damages. We disagree, as we did in *Boston Professional Hockey,* 597 F.2d at 75–76 (plaintiff's failure to quantify any damages from diverted sales did not preclude recovery for deprivation of economic benefits that would have accrued from licensing; *see also Shen Mfg. Co. v. Suncrest Mills, Inc.,* 673 F.Supp. 1199, 1206 (S.D.N.Y.1987) (defendant's intentional copying entitles plaintiff to profits based on unjust enrichment theory despite failure to prove any instance of actual confusion). Because we embrace the "headstart" theory as the apt framework for monetary recovery, we need not pursue the issue of actual diverted sales.

Especially given the volatility of the restaurant industry, and the significant value of securing the image of "market leader," we believe the "headstart" theory provides an apt framework for Taco Cabana's monetary recovery. Two Pesos' infringement foreclosed the Houston market, which Gabriel Gelb characterized as "one of the most affluent Mexican food markets in the country." Based on the Houston market alone, Gelb estimated lost profits of $4.4 million. Other damage models produced even higher figures. The jury award easily

---

**19.** Congress codified this resounding support for consistent remedies by enacting the Trademark Law Revision Act on November 16, 1988 which, *inter alia,* amended section 35 to include section 43(a) violations. 15 U.S.C.A. § 1117(a) (West Supp.1991).

qualifies as reasonable compensation to Taco Cabana.

## D. Enhanced Damages.

Finding that Two Pesos' conduct was willful and deliberate, the district court doubled the jury award for infringement. Judge Singleton asserted that "[u]nder the facts of this case and listening to the witnesses and judging the credibility myself, I can come to no other conclusion than to find that Two Pesos' actions were willful in the sense that it was deliberate.... The evidence was overwhelming." Intentional imitation alone—as opposed to intentional infringement—would not suffice for the requisite bad faith, but as his Order recites, Judge Singleton found "that Two Pesos intentionally and deliberately infringed Taco Cabana's trade dress."

We must respect the fact that section 35 endows the district court with considerable discretion in fashioning an appropriate remedy for infringement. An enhancement of damages may be based on a finding of willful infringement, but cannot be punitive. *Playboy Enterprises, Inc. v. P.K. Sorren Export Co.*, 546 F.Supp. 987, 998 (S.D.Fla.1982); *see* 15 U.S.C.A. § 1117(a) (West Supp.1991) (any sum in excess of actual damages must "constitute compensation and not a penalty").

It is anomalous to say that an enhancement of damages, which implies an award exceeding the amount found "compensatory," must be "compensatory" and not "punitive." Responding to that anomaly, we have suggested that enhancement could, consistent with the "principles of equity" promoted in section 35, provide proper redress to an otherwise undercompensated plaintiff where imprecise damage calculations fail to do justice, particularly where the imprecision results from defen-

dant's conduct. *Boston Professional Hockey*, 597 F.2d at 77 (increased damages justified when defendant withholds or misrepresents available sales records or otherwise obstructs ascertainment of damages); *accord P.K. Sorren*, 546 F.Supp. at 998–99 (award of excess damages appropriate where "record strongly indicates that plaintiff's damages and defendants' profits were both greater than the amounts conclusively proven"). We find no evidence of information obstruction by Two Pesos, but we acknowledge the trial court's superior capacity to discern the elements of equitable compensation. Given the substantial evidence of willful infringement,[20] the jury finding of trade secret misappropriation, and the evidence of substantial damages not reflected in the jury award, we cannot say that Judge Singleton abused his discretion.

## E. Attorney Fees.

Section 35 of the Lanham Act permits an award of attorneys' fees in "exceptional cases." The judicial definition of an exceptional case often appears indistinguishable from the standard for enhancement of damages: some form of willful, deliberate, or fraudulent conduct. Indeed, Taco Cabana invites us to apply the same standard, employ the same evidence, and affirm on that basis. We decline to conflate the standards because some cases may well warrant one form of recovery and not the other,[21] and we do not wish so to regiment the discretion of district courts seeking equity.

We review for abuse of discretion, mindful that "the district court heard the evidence, saw the witnesses, and appraised their motives. Based on its personal observations, the court found that [defendant's] conduct was 'certainly intentional' and de-

---

**20.** The weight of the evidence persuades us, as it did Judge Singleton, that Two Pesos brazenly copied Taco Cabana's successful trade dress, and proceeded to expand in a manner that foreclosed several lucrative markets within Taco Cabana's natural zone of expansion. *Cf. Weiner King, Inc. v. Wiener King Corp.*, 615 F.2d 512, 522 (C.C.P.A.1980) (junior user's knowledge of senior user coupled with attempt to box in sen-

ior user by cutting off expansion can support finding of bad faith in registration hearing).

**21.** *See, e.g., Playboy Enterprises, Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1276 (9th Cir.1982) (affirming district court's refusal to enhance damages, but reversing refusal to award attorneys' fees).

signed to reduce [plaintiff's] sales." *Nu-Pulse*, 853 F.2d at 547 (affirming award of fees); *see also Shen Mfg.*, 673 F.Supp. at 1207 (defendant's intentional copying makes case "exceptional" and entitles plaintiff to punitive damages and attorneys' fees). Some conscious good-faith effort by Two Pesos to create elements of dissimilarity might have rendered this case "unexceptional." *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 942 (7th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990). But Two Pesos earns no such saving grace. Given the evidence of brazen imitation and rapid market foreclosure, we find no abuse of discretion in the award of attorneys' fees.[22]

F. Trade–Secret Damages.

 Trade-secret misappropriation damages typically embrace some form of royalty. *Metallurgical*, 790 F.2d at 1208 ("reasonable royalty" aptly defines measure of damages in trade secret misappropriation case); *Sikes v. McGraw–Edison Co.*, 665 F.2d 731, 737 (5th Cir.) (affirming award of damages that represented reasonable per unit royalty), *cert. denied*, 458 U.S. 1108, 102 S.Ct. 3488, 73 L.Ed.2d 1369 (1982). With the evidence of sales in the scores of millions and impressive profits, the jury's single award of $150,000 is not unreasonable.

The judgment of the district court is AFFIRMED.

---

**22.** The parties stipulated that attorneys' fees of $937,500 were reasonable if the district court could properly award fees.