**INTEROX AMERICA,**
**Plaintiff-Appellant,**

v.

**PPG INDUSTRIES, INC.,**
**Defendant-Appellee.**

**No. 84–2033.**

United States Court of Appeals,
Fifth Circuit.

July 12, 1984.

D. Stuart Meiklejohn, Norman Feit, New York City, Miller & Keeton, Richard P. Keeton, David E. Sharp, Houston, Tex., for plaintiff-appellant.

Dickie, McCamey & Shilcote, David Armstrong, Pittsburg, Pa., Andrews & Kurth, Edith Jones, Houston, Tex., for defendant-appellee.

Before THORNBERRY, WILLIAMS and GARWOOD, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Appellant Interox America purchased a hydrogen peroxide business from appellee PPG Industries, Inc. The sales agreement executed by the parties provided that the plant which was located on PPG's property in Barberton, Ohio, would revert back to PPG for disposition if Interox elected not to remove any component parts from the plant site. The component parts consisted primarily of the machinery and equipment used to produce the hydrogen peroxide. Interox chose not to remove any of the component parts, and upon reversion back, PPG sold the plant machinery and equipment to a third party, Peroxide Phillipines Corporation. In the district court, Interox sought to enjoin PPG's sale of the plant to Peroxide Phillipines Corporation, claiming that the sale constituted a breach of the sales contract executed by Interox and PPG and a wrongful disclosure of the trade secrets allegedly included in Interox's purchase of the hydrogen peroxide business. The district court denied Interox's request for preliminary injunction. We affirm.

The parties entered into the sales agreement on September 17, 1982, after extensive negotiation. During the negotiation process, several drafts of the sales agreement were made. One of the major subjects of revision was Paragraph 13 of the agreement. In the earliest draft of the agreement, this paragraph read in part:

6.04 No later than—months after the date of closing, Interox America will notify PPG in writing of what assets, if any Interox America wishes to remove from the PPG plant. Interox America will remove all such equipment within eighteen months after the date of closing. If Interox America elects to remove any plant fixed assets, Interox America and PPG will share equally the net costs of demolishing the remainder of the plant (after deduction of salvage payments) up to a maximum of $250,000; all the costs above that amount shall be borne by PPG. If Interox America elects not to remove any fixed assets from the plant site, PPG will arrange and pay for demolition of the plant and receive any salvage payments therefor.

In subsequent revisions of this paragraph, all references to the word "demolition" were changed to "disposition" at PPG's instigation. Paragraph 13 of the final agreement read:

No later than twelve months after the Closing, Buyer will notify Seller in writing of what components (including working solution), if any, Buyer wishes to remove from the Seller's Plant. Buyer will remove all such components within eighteen months after Closing. If Buyer elects to remove any one component from Seller's Plant within the eighteen month period, Buyer will be responsible for removing all components of Seller's Plant from Seller's Barberton, Ohio, property at Buyer's sole cost and expense, unless otherwise agreed to in writing by the parties. Such removal of components by Buyer shall include all dismantling, removal and salvage of all property of Buyer (whether owned, rented or leased) including the restoration of the site to grade or foundation levels, it being understood that Buyer shall have no responsibility to remove foundation concrete but shall be responsible for removing to grade level structural steel and miscellaneous above-grade-level concrete structures not connected to foundations with reinforcing rod (such as pump pads and the like) and to brush clean the remaining foundation. If Buyer elects not to remove any components from Seller's Plant within the eighteen month period, such assets shall be considered abandoned in place and Seller, at Seller's cost and expense, will arrange and pay for disposition of Seller's Plant and receive any salvage payments therefor. In either event, Seller will direct the disposition of Seller's Plant.

Contemporaneous with the execution of the sales agreement, PPG and Interox entered into a letter agreement also dated September 17, 1982, pursuant to which PPG agreed to operate the hydrogen peroxide business at the Barberton site for Interox for an indefinite period following the closing of the sale. This operating agreement was made to provide continuity to PPG's former and Interox's new customers until production could be increased at Interox's hydrogen peroxide plant in Deer Park, Texas. As part of the operating agreement, Interox granted PPG the right to use the hydrogen peroxide technology and know-how provided that PPG did not disclose certain confidential information to third parties.

Interox notified PPG of its decision not to remove any component parts from the plant by letter dated April 15, 1983. Tracking the language of Paragraph 13 of the agreement, Interox stated in the April 15 letter: "Plant assets are thus to be considered abandoned in place and the disposition of the assets is PPG's sole responsibility." Consequently, as stipulated in the sales agreement, the plant reverted back to PPG for disposition. PPG disposed of the plant by selling it to the Peroxide Phillipines Corporation, a company engaged in the production of hydrogen peroxide in the Phillipine Islands. The sale to Phillipines was finalized on September 20, 1983, by PPG and Mustang Engineering company, acting as agent for Phillipines. The agreement stipulated that the sale was for physical assets only and that hydrogen peroxide technology and know-how were excluded from the sale.[1] The agreement also prohibited Phillipines from reassembling the plant in the United States.

Interox commenced this action on January 5, 1984, by filing a complaint in the United States District Court seeking preliminary and permanent injunctive relief. The complaint averred that PPG had violated the agreement of sale executed by PPG and Interox on September 17, 1982. Specifically, Interox complained that Para-

---

1. The purchase and sale provision of the sales agreement between PPG and Phillipines read:

   1. *Purchase and Sale*
     PPG shall sell and transfer to Buyer and Buyer shall purchase and accept, on an "as is/where is" basis, the machinery and equipment set forth in Exhibit A and the spare parts set forth in Exhibit B (such machinery, spare parts and equipment herein collectively referred to as the "Equipment"), formerly used by PPG in the operation of the hydrogen peroxide plant in Barberton, Ohio. The equipment shall not include any real property nor buildings, construction drawings, technology, or know-how.

graph 13 of the agreement required PPG to demolish the plant upon reversion back. Interox also alleged that PPG's sale of the plant to Phillipines breached the operating agreement executed on September 17, 1982, and that the sale constituted a wrongful disclosure of trade secrets. The complaint also requested that the district court order PPG to demolish the plant.

On January 6, 1984, the district court issued a temporary restraining order pending a hearing on Interox's motion for a preliminary injunction. After a hearing, the court denied injunctive relief, finding that Interox failed to sustain its burden of establishing the first three of the following well-established factors necessary to merit the granting of preliminary injunctive relief: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) the threatened injury to the movant outweighs any potential harm the injunction will cause to the opponent; and (4) the injunction will not disserve the public interest. *Commonwealth Life Insurance Company v. Neal*, 669 F.2d 300, 303 (5th Cir.1982).[2] This denial of a preliminary injunction is before us for review.

In reviewing the district court's decision, we note that the decision to grant or deny a preliminary injunction lies within the discretion of the district court and may be reversed on appeal only by a showing of an abuse of discretion. *Apple Barrel Production, Inc. v. Beard*, 730 F.2d 384, 386 (5th Cir.1984).

## SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

Interox relies primarily upon the drafting history of the sales agreement to demonstrate that it is likely to succeed on the

merits in a breach of contract action against PPG. Interox emphasizes its claim that the earlier drafts of the sales agreement required PPG to demolish the plant upon reversion back. Interox urges this proves that the parties intended to place an obligation upon PPG to demolish the plant, thwarting a right to sell the plant in its entirety to a third party.

Interox buttresses this contention by urging that the language of Paragraph 13 of the contract indicates that the "disposition" contemplated by that section was one that would impose "cost and expense" on PPG, that would require PPG to "arrange and pay for disposition," and that would yield to PPG "salvage payments." These phrases, it is said, were used from the outset of the drafting to make plain that the parties meant a disposition imposing a liability on the party responsible for disposition, not an opportunity for profit. To Interox, the contract required only that the party responsible for disposition would be entitled to the recovery of residual scrap value, not the plant's value as an operating unit.

In contrast, PPG argues that the absence of any reference to the words "demolish" or "demolition" in the final sales agreement meant that the parties intended to eliminate PPG's obligation to demolish the plant and to impose instead an obligation merely to "dispose" of the plant. PPG also points out that the sales agreement contains an integration clause which states that the written contract constitutes the full and final agreement between the parties.

Citing *West Weir and Bartel, Inc. v. Mary Carter Paint Co.*, 25 N.Y.2d 535, 540, 307 N.Y.S.2d 449, 452, 255 N.E.2d 709, 711 (1969),[3] PPG maintains that the parol evidence rule prohibits the court from looking at earlier drafts of the agreement to

---

**2.** It is the movant's burden to establish *each* of the four prerequisites in order to obtain injunctive relief. *Spiegel v. City of Houston,* 636 F.2d 997, 1001 (5th Cir.1981). Thus, in light of its finding that Interox failed to prove the first three prerequisites, the district court did not address the last prerequisite.

**3.** Paragraph 31 of the sales agreement between Interox and PPG provided that the contract would be governed by the law of the State of New York.

interpret the terms of the final agreement. The district court denied PPG's motion to exclude evidence of the negotiations and the drafts which preceded the final agreement. The court stated, however, that the language of Paragraph 13 was "perfectly obvious" and found that the evidence showed that PPG expressly brought about the elimination of the words "demolish" and "demolition" from the sales agreement.

Since this is a hearing on a preliminary injunction with the record in a preliminary stage, we accept the district court's ruling that the parol evidence rule did not apply and that the drafting history of the sales agreement was relevant and was to be considered. We agree with the district court that this evidence does not support Interox's position that the parties reached a mutual agreement that the plant be demolished.

Aside from the drafts of the sales agreement, the only evidence that Interox offered to show that the parties intended that the plant be demolished was the testimony of David J. Birney, Interox's vice president of marketing, and John McKenzie, Interox's vice-president-technical. Birney testified that he could recall no discussion between Interox and PPG of the reasons for the substitution of the word "disposition" for "demolition". He stated that at the time the words were changed, he considered them to be synonymous. McKenzie also testified that although he could not recall a specific discussion regarding the change in wording, he, too, thought that Paragraph 13 as it stood in the final agreement required PPG to demolish the plant. Interox offered no evidence to show that both parties had specifically agreed that the plant was to be demolished nor any evidence that the parties expressly agreed that the plant could not be sold in its entirety. Interox is unable to point to any provision in the contract which states that a sale of the plant is a transfer of know-how. Nor is there any prohibition in the contract of the right to sell the plant in its entirety. Finally, Interox made no mention of a purported obligation of PPG to demolish the plant in its April 15, 1983, letter to PPG informing PPG of its decision to abandon the plant in place.

■ We are unwilling to presume, as Interox suggests, that the absence of proof of a discussion during the negotiations regarding the word change indicates that both parties intended the change in the words to have no effect. In seeking to ascertain the actual intent of the parties, a court must look to what was, or should have been, reasonably apparent to the contracting parties. *United States v. Continental Casualty Company*, 210 F.Supp. 433, 436 (S.D.N.Y.1962). The fact that the words were changed by PPG suggests that it should have been reasonably apparent to Interox that PPG perceived the obligation to demolish the plant as being different from an obligation merely to dispose of the plant.

■ It is a well-settled principle under New York law, as well as under general contract law, that in the absence of evidence that the parties intended otherwise, words used in a contract should be assigned their plain and literal meaning. *Alland v. Consumers Credit Corp.*, 476 F.2d 951, 956 (2d Cir.1973); *Broad v. Rockwell International Corp.*, 642 F.2d 929, 948 (5th Cir.), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). Because the evidence is insufficient to show that both parties intended that the word "dispose" be interpreted to mean "demolish", we conclude that the district court did not abuse its discretion in finding that the two words are not synonymous and in finding that the contract "was obviously very deliberately worded so as to eliminate the language demolish or demolition." Thus, we agree with the district court that "while the reversion back [provision] ... might have been sharp trading on the part of PPG," the provision did not require PPG to demolish the plant.

■ Interox also attempts to establish a likelihood of success on the merits by arguing that PPG's sale of the plant to Phillipines constitutes a breach of the operating

agreement executed by Interox and PPG at the same time they signed the final sales agreement. The operating agreement states that during the interim period of operation, PPG "shall not disclose to any party the confidential information received from Interox, nor use the confidential information received from Interox for any purpose except to manufacture, store ... and ship hydrogen peroxide for Interox America."

The operating agreement also states that no information will be deemed confidential if "PPG can demonstrate that it was in PPG's possession before disclosure by Interox." Interox concedes that it did not develop or disclose to PPG any new trade secrets during the interim operating period. This leads us logically to conclude that PPG did not breach the confidentiality provision of the operating agreement because all the information PPG possessed regarding the production of hydrogen peroxide was in its possession prior to the interim operating period.

Lastly, in related claims, Interox argues (1) that PPG's sale of the plant involves the sale of property which PPG had already sold to Interox, i.e., technology; and (2) that PPG's sale of the plant to Phillipines, therefore, constitutes a tortious disclosure of trade secrets as defined by section 757 of the Restatement of Torts.[4]

In response to the first contention, we turn our attention to the actual language of the Interox-PPG sales agreement. The agreement lists the following as property purchased by Interox under the contract:

(c) *Purchased Property* means:

   *     *     *     *     *     *

(2) ... (iii) all rights and interest of Seller in and to all intellectual property rights and proprietary expertise relat-

---

**4.** Section 757 provides:

One who discloses or uses another's trade secrets, without a privilege to do so, is liable to the other if (a) he discovers the secret by improper means, or (b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him.

ing to the HP [hydrogen peroxide] Business products and used by Seller as of the Closing Date in its commercial production of hydrogen peroxide and insofar as Seller's rights thereto permits the sale or transfer thereof ... including trade secrets, know-how, product formulae, manufacturing and engineering data, research and development records, and toxicological and ecological data ("HP Business Know-How") ...

The list of various components of "HP Business Know-How" does not include a reference to the configuration of the plant. Further, Interox concedes that the agreement does not state that the sale of the plant would be a sale of technology—a provision which could have been included. Indeed, our review of the overall agreement indicates that plant design was treated by the parties as a fixed asset. When abandoned by Interox, it reverted back to the possession of PPG for disposition pursuant to Paragraph 13.

In order to succeed on its claim based upon tortious disclosure of trade secrets, Interox must show that the information disclosed by a sale of the plant constitutes a trade secret and that such disclosure would be wrongful. *See Hurst v. Hughes Tool Co.*, 634 F.2d 895, 896 (5th Cir.), *cert. denied*, 454 U.S. 829, 102 S.Ct. 123, 70 L.Ed.2d 105 (1981); *E.I. duPont deNemours & Company, Inc. v. Christopher*, 431 F.2d 1012, 1014 (5th Cir.1970), *cert. denied*, 400 U.S. 1024, 91 S.Ct. 581, 27 L.Ed.2d 637 (1971). We conclude that the evidence fails to show that Interox is likely to succeed in establishing the first factor. Because we decide that the information to be disclosed does not constitute a trade secret, we need not address the issue of the wrongfulness of the disclosure.

*See also Hyde Corp. v. Huffines*, 158 Tex. 566, 314 S.W.2d 763, *cert. denied*, 358 U.S. 898, 79 S.Ct. 223, 3 L.Ed.2d 148 (1958). Choice of law being uncontested, we see no reason to depart from the evident assumption of both parties that Texas law applies on this issue because Interox is a Texas partnership with the principal place of business in Texas.

Interox has not demonstrated how the mechanical configuration of the plant itself embodies and reflects trade secrets. On the contrary, the evidence shows that much of the information disclosed by the configuration of the plant is publicly available in the industry literature.

The hydrogen peroxide process technology involved is called auto oxidation (AO). The record indicates that there are approximately 35 hydrogen peroxide producers in the world who use the AO process. McKenzie, Interox's technical vice president, testified that the general chemistry of the AO process is published and thus fairly well known in the industry. He testified, however, that information on the exact mechanical operations of the AO process is not published in great detail. Interox contends that the sale of the plant machinery and equipment on an "as is, where is" basis discloses to Phillipines information on the interaction of the pieces of equipment, and therefore, reveals trade secrets on the details of the mechanics of the AO process. Interox argues that the sale of the plant to a demolition contractor would not disclose such trade secrets about its AO process because a demolition contractor would be interested in simply dismantling the plant as quickly as possible and selling the individual pieces of equipment. Moreover, the sale of the individual pieces by the demolition contractor would not reveal trade secrets because such individual sales would convey only small amounts of information out of context.

We are not persuaded. Contrary to Interox's assertions, the record indicates that any trade secrets involved consist of the chemical solvents and working fluids needed to produce the hydrogen peroxide and the amounts of and order in which the chemicals and reactive agents are used. On cross-examination, McKenzie conceded that mere acquisition of the plant will not convey to Phillipines information on, for example, which particular anthraquinone

will work well in practice, or which catalyst will work best in the hydrogenation of each individual anthraquinone, or which reversion agent should be used. It is undisputed that the operation of the hydrogen peroxide plant without the benefit of information on the proper chemical processes would be extremely difficult and dangerous.

It is also undisputed that the chemicals and working solutions were not included in PPG's sale of the plant to the Phillipines.[5] In a letter responding to Phillipines' inquiry about the sale of the plant, PPG stated:

> PPG does not possess any technology in the production of hydrogen peroxide. Our ownership is limited solely to the hardware at the site. The engineering drawings of the facility are not PPG's property. If we were to sell these assets to Mustang Engineering or its client [Phillipines], it would have to be on an "as is, where is" basis much as we would to a demolition contractor.

Thus, while we do not doubt that information conveyed to Phillipines by the sale of the plant was of aid to Phillipines in its production of hydrogen peroxide, we cannot say that the information rises to the level of a trade secret.

Our conclusion that the configuration of the plant does not constitute disclosure of trade secrets is buttressed by several factors. First, we note that the record shows that the Barberton plant is situated near a highway. There is no wall around the plant, and most of the equipment is located outside the buildings. Interox admits that the plant, therefore, can be easily photographed or sketched from a number of angles. That which is readily visible and ascertainable cannot constitute a trade secret. *See, e.g., Furr's Inc. v. United Specialty Advertising*, 338 S.W.2d 762 (Tex. Civ.App.—El Paso 1960, writ ref'd n.r.e.).

---

5. At the hearing, McKenzie testified that even a fraction or gram of solution would be sufficient to disclose information as to the contents of the working solution. Interox failed, however, to present any evidence that any solution was left in the equipment after production ceased at the plant.

■ Further, of importance to the district court was the fact that Interox gave to two demolition contractors copies of a manual containing a list of all the machinery and equipment at the Barberton plant. Interox admits that one of these contractors could have purchased the plant and in turn sold the plant and the manual to Phillipines or any other hydrogen peroxide producer. The district court therefore reasoned that Interox voluntarily disclosed the information which it now seeks to protect by its request for a preliminary injunction. One who voluntarily discloses information or who fails to take reasonable precautions to ensure its secrecy cannot properly claim that the information constitutes a trade secret. *E.I. duPont deNemours, supra,* 431 F.2d at 1015.

In light of the foregoing, we conclude that the district court did not abuse its discretion in deciding that Interox failed to establish a substantial likelihood of success on the merits of its underlying claims against PPG based upon breach of contract and wrongful disclosure of trade secrets. Interox must establish all four factors to receive injunctive relief. We hold it has not established the first. We consider the others as is customary in such cases, but with brevity.

### IRREPARABLE INJURY TO PLAINTIFF

■ An injury is irreparable if it cannot be undone through monetary remedies. *Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir. 1981). Interox contends that it will suffer irreparable injury from PPG's sale of the plant to Phillipines because its trade secrets will be disclosed and the value of its technology, therefore, diminished.

■ Interox has not shown that a monetary remedy would be inadequate compensation for any injury allegedly incurred as a result of the sale of the plant. The record shows that one of the parent companies of Interox, LaPorte Industries, has granted at least six licenses for the AO hydrogen peroxide process technology at a specific royalty. Further, McKenzie testified that the value of such know-how could be as much as one million, one hundred thousand dollars. Thus, it is clear that even if Interox succeeded on its breach of contract claims against PPG, an adequate damage award could be assessed based upon either the estimated value of the technology or upon the value paid by a licensee of the technology.

Interox analogizes its case to the situation in *FMC Corp. v. Varco International, Inc.,* 677 F.2d 500 (5th Cir.1982). In *Varco,* Witt, a former engineer of FMC who had participated in FMC's development of a swivel joint used in connection with oil well piping, joined a competitor expressly to direct development of a similar product. We held that FMC was entitled to a preliminary injunction enjoining Witt from divulging to his new employer any trade secret he acquired while working at FMC and barring the new employer from placing Witt in any position in which secrets might be disclosed.

*Varco* is readily distinguishable from the case at bar. In *Varco* it was clear that the information sought to be protected by FMC constituted a trade secret. Moreover, the employee had signed a specific contract with FMC agreeing not to disclose trade secrets upon accepting a new position with a competitor. In the instant case, Interox has not shown that the configuration of the plant constitutes a trade secret, nor does the sales agreement state that the plant design constitutes a trade secret. Moreover, unlike in *Varco,* in this case we are presented with a situation where the plaintiff expressly abandoned the assets which it now claims constitute trade secrets.

### BALANCE OF HARM

■ Interox argues that if the injunction is not issued, it will lose thousands of dollars worth of trade secrets because the plant will be inspected, sketched, dismantled, and removed from the United States by the time the case is tried on the merits. It argues that PPG will suffer no adverse consequences from the issuance of the in-

junction because the contract between PPG and Phillipines can simply be held in abeyance until after the trial on the merits. From our review of the facts, we cannot conclude that the balance of hardships clearly tips in Interox's favor.

Even if Interox succeeded in proving its claims in a trial on the merits, the value of the hydrogen peroxide process technology can be assessed. Thus, Interox could be adequately compensated for any damages resulting from a breach of contract by PPG. As for the possible hardship to PPG if the injunction is issued, the sales agreement between PPG and Phillipines has already been consummated and removal of the plant equipment and machinery has commenced.[6] Therefore, if the injunction were granted, it is likely that PPG will face a suit for breach of contract by Phillipines. Hence, we conclude that the district court did not abuse its discretion in deciding that Interox failed to make a sufficient showing on the balance of harm issue.

## PUBLIC INTEREST

The district court, as we stated above, did not address the question of public policy considerations, presumably because it found that Interox had failed to satisfy the first three prerequisites for a preliminary injunction. We address the public policy issue only to note Interox's contention that the strong public interest in this case is in enforcing contracts. This interest is served, however, by enforcing contract terms as they were intended by the parties. Because we conclude that Interox has not established that both parties intended that PPG would be obligated to demolish the plant, public policy cannot require an injunction forbidding PPG from selling the plant to Phillipines.

The evidence offered by Interox falls far short of justifying relief by way of a preliminary injunction in this case.

AFFIRMED.

6. Since Interox was unable to obtain a stay of the district court's order pending appeal, PPG was entitled to treat the order as final and

proceed with the sale of the plant to Phillipines. *H.K. Porter Co., Inc. v. Metropolitan Dade County,* 650 F.2d 778, 782 (5th Cir.1981).