Opinion issued December 17, 2009




 





 













 In The

Court of Appeals

For The

First District of Texas






NO. 01-09-00504-CV






INEOS GROUP LTD., INEOS TECHNOLOGIES, INEOS AMERICAS
LLC, INEOS MANUFACTURING BELGIUM NV, INEOS LLC, INEOS
EUROPE LIMITED, INEOS POLYETHYLENE NORTH AMERICA,
INEOS USA LLC, AND INEOS OLEFINS, LP, Appellants


v.


CHEVRON PHILLIPS CHEMICAL COMPANY, LP, Appellee






On Appeal from County Court At Law No. 2 

Galveston County, Texas

Trial Court Cause No. 57,741






O P I N I O N


 INEOS (1) appeals the trial court's issuance of a temporary injunction prohibiting
it from soliciting, negotiating, or entering into technology licensing agreements for
a particular grade of polyethylene plastic made by using a certain manufacturing
process. The temporary injunction is based on Chevron Phillips Chemical
Company's ("CPChem") claim that the technology underlying this manufacturing
process is derived from its trade secrets. In one issue, INEOS argues that the
technology is no longer entitled to trade secret protection because, through a lack of
vigilance, CPChem disclosed the technology to third parties, which are no longer
required to keep the information confidential.

 Because INEOS has not shown that the trial court abused its discretion by
issuing the temporary injunction, we affirm. 

Factual & Procedural Background


 Beginning in the early 1950s, Phillips Petroleum Company, a corporate
predecessor of CPChem, developed technology important to the manufacturing of
polyethylene plastic. Phillips discovered that a chrome catalyst could be used to
make high density polyethylene, a tough, durable plastic. In 1958, a Phillips engineer
invented the loop slurry process for manufacturing high density polyethylene. This
process had a number of advantages. It permitted high density polyethylene to be
made more cheaply, more efficiently, more reliably, and in greater quantities than the
previous process allowed. 

 In 2000, Chevron Chemical merged with Phillips to create CPChem. At that
time, CPChem acquired the ownership rights to the loop slurry process. Since the
1950s, Phillips and CPChem have invested significant time and money to further
develop the loop slurry technology. 

 Phillips provided the loop slurry technology to other chemical companies
through licensing agreements. This enabled the licensee company to construct its
own loop slurry plant to manufacture high density polyethylene. Under a licensing
agreement, the licensee received a license package, which included the technical
information necessary to construct a loop slurry plant. In the package, Phillips
provided not only its most recent loop slurry technology to the licensee, but also
provided its historical technical information reaching back to the 1950s. After a
licensee had constructed its loop slurry plant, Phillips continued to share updated
technical information with the licensee as the information was developed. Since
1958, Phillips and CPChem have entered into over 100 licensing agreements for the
loop slurry technology. CPChem succeeded to the license interests of Phillips after
the merger between Phillips Chemical and Chevron Chemical. 

 In the mid-1950s, Phillips entered into licensing agreements with Distillers
Company Limited, Celanese Corporation, and an Italian company, Solvay. Under
these agreements, Phillips provided technical information for the construction of
polyethylene manufacturing plants. Each agreement contained a perpetual
confidentiality provision, requiring the licensee to keep the technical information
provided by Phillips confidential into perpetuity. 

 Phillips continued to share its technical information, including its loop slurry
technology, with the licensees until 1974. Years later, the manufacturing plants
constructed under the three licenses became part of a joint venture between Solvay
and BP International Limited. In 2004, BP purchased Solvay's interest in the joint
venture. BP then formed a separate company, Innovene, to hold the assets of the joint
venture, including the plants constructed pursuant to the three licenses. The next year
INEOS purchased Innovene. As a result, INEOS succeeded to the interests of the
original licensees. 

 When it purchased Innovene, INEOS also acquired Innovene's loop slurry
process. INEOS soon began licensing the Innovene loop slurry technology to third
parties. Pursuant to three separate licensing agreements, INEOS provided the
Innovene loop slurry technology to three Chinese companies for the construction of
polyethylene plants. 

 After learning of the licensing agreements, CPChem filed suit against INEOS
for misappropriation of trade secrets and breach of contract. CPChem alleged that the
loop slurry technology licensed by INEOS contained the loop slurry technology
provided by Phillips to INEOS's predecessors under the 1950s licenses. CPChem
alleged that the loop slurry technology disclosed by INEOS to its licensees was
CPChem's trade secrets and confidential information. CPChem further claimed that
INEOS's licensing of the technology violated the perpetual confidentiality provisions
of the three 1950s licensing agreements between Phillips and INEOS's predecessors. 
CPChem sought permanent injunctive relief and damages.

 After CPChem filed suit, INEOS continued to license the Innovene loop slurry
technology to other companies. CPChem requested the trial court to grant a
temporary injunction prohibiting INEOS from disclosing the Innovene loop slurry
technology to any third party, including INEOS's licensees, pending trial. 

 The trial court conducted an eight-day evidentiary hearing on CPChem's
application for temporary injunction. Among its grounds for opposition to the
temporary injunction, INEOS argued that, over the years, CPChem failed to diligently
maintain the secrecy of its loop slurry technology. INEOS cited agreements under
which Phillips had disclosed its loop slurry technology without requiring the licensee
to maintain the confidentiality of the technology into perpetuity. INEOS specifically
relied on agreements signed by Phillips containing secrecy clauses that had expired
years earlier. 

 CPChem responded that no evidence exists to show that the expiration of the
confidentiality provisions resulted in the public disclosure of its loop slurry
technology. CPChem offered evidence showing that the potential threat of disclosure
of its trade secrets following the expiration of the confidentiality provisions had been
ameliorated or neutralized with respect to each of the agreements cited by INEOS.

 At the hearing's conclusion, the trial court granted CPChem's request for a
temporary injunction. The trial court did not file findings of fact or conclusions of
law, but determined in its order that CPChem "has established (a) viable causes of
action against INEOS, (b) a probable right to the relief sought on those causes of
action, and (c) a probable, imminent, and irreparable injury in the interim for which
CPChem has no adequate remedy at law." 

 In the order, the trial court narrowly tailored the injunctive relief granted to
CPChem. Specifically, the trial court ordered that INEOS is 

 temporarily enjoined from soliciting, negotiating, or entering into
licenses for monomodal high density polyethylene grade of 5502 having
a melt index in the range of 0.3 to 0.4 and a density of 954-957
kilograms per cubic meter by whatever name made using a chrome
catalyst in a loop slurry process. 


 INEOS appeals, challenging the temporary injunction in one issue. (2) 

Temporary Injunctions: Standard and Scope of Review


 The sole issue presented to a trial court at a temporary injunction hearing is
whether the applicant may preserve the status quo pending trial on the merits. 
Butnaru v. Ford Motor Co., 84 S.W.3d 198, 204 (Tex. 2002); Davis v. Huey, 571
S.W.2d 859, 862 (Tex. 1978). Whether to grant or deny a temporary injunction is
within the trial court's sound discretion. Butnaru, 84 S.W.3d at 204. 

 On appeal, the scope of review is limited to the validity of the temporary
injunction order. See Walling v. Metcalfe, 863 S.W.2d 56, 58 (Tex. 1993). We do not
review the merits of the underlying case. Davis, 571 S.W.2d at 861. Instead, we
determine whether there has been an abuse of discretion by the trial court in granting
or denying the relief. Id. at 862. In making this determination, we may not substitute
our judgment for that of the trial court unless its decision was so arbitrary that it
exceeded the bounds of reasonableness. See Butnaru, 84 S.W.3d at 204. Abuse of
discretion does not exist if the trial court heard conflicting evidence, and evidence
appears in the record that reasonably supports the trial court's decision. Davis, 571
S.W.2dat 862; CRC-Evans Pipeline, Int'l, Inc. v. Myers, 927 S.W.2d 259, 262 (Tex.
App.--Houston [1st Dist.] 1996, no writ). A trial court abuses its discretion in
granting or denying a temporary injunction when it misapplies the law to the
established facts. See State v. Sw. Bell Tel. Co., 526 S.W.2d 526, 528 (Tex. 1975). 
Given the abuse-of-discretion-standard, we review the evidence submitted to the trial
court in the light most favorable to the court's ruling, draw all legitimate inferences
from the evidence, and defer to the trial court's resolution of conflicting evidence. 
See Davis, 571 S.W.2d at 862; CRC-Evans Pipeline, Int'l, 927 S.W.2d at 262. 

Probable Right of Relief


 A temporary injunction is an extraordinary remedy that does not issue unless
the party seeking relief pleads and proves three specific elements: (1) a cause of
action, (2) a probable right to the relief sought, and (3) a probable, imminent, and
irreparable injury in the interim. Butnaru, 84 S.W.3d at 204. To show a probable
right of recovery, an applicant need not establish that it will finally prevail in the
litigation, but it must, at the very least, present some evidence that, under the
applicable rules of law, tends to support its cause of action. Camp v. Shannon, 348
S.W.2d 517, 519 (Tex. 1961); see IAC, Ltd. v. Bell Helicopter Textron, Inc., 160
S.W.3d 191, 197 (Tex. App.--Fort Worth 2005, no pet.). 

 In its sole issue, INEOS asserts that CPChem failed to demonstrate a probable
right of relief on its misappropriation of trade secrets claim. More precisely, INEOS
argues that CPChem failed to demonstrate that its loop slurry technology constitutes
a trade secret. 

 A trade secret is "any formula, pattern, device or compilation of information
which is used in one's business and presents an opportunity to obtain an advantage
over competitors who do not know or use it." In re Bass, 113 S.W.3d 735, 739 (Tex.
2003). To determine whether a trade secret exists, a court weighs six fact-intensive
factors: (1) the extent to which the information is known outside of the business; (2)
the extent to which it is known by employees and others involved in the business; (3)
the extent of measures taken to guard the secrecy of the information; (4) the value of
the information to the business and to its competitors; (5) the amount of effort or
money expended in developing the information; (6) the ease or difficulty with which
the information could be properly acquired or duplicated by others. See id. (citing
Restatement of Torts § 757 cmt. b. (1939); Restatement (Third) of Unfair
Competition § 39 reporter's note cmt. d. (1995)). INEOS asserts that the first and
third factors--the extent to which the information is known outside of the business
and the extent of measures taken to guard the secrecy of the information--are of
predominant consideration in this case. 

 INEOS acknowledges that CPChem's loop slurry technology was at one time
a trade secret. (3) Nevertheless, INEOS asserts that the information lost trade secret
status due to CPChem's lack of vigilance with respect to guarding the secrecy of the
information. 

 To support its argument, INEOS offered a number of agreements between
Phillips and third-party companies. Several of these agreements contained fixed-term
secrecy provisions, which required the other party to maintain the confidentiality of
Phillips's disclosed trade secrets for a set number of years. 

 At the time of the hearing, the period defined in each of these fixed-term
secrecy clauses had expired. INEOS argued that, following the expiration of the
secrecy provisions, the third parties, with whom Phillips had contracted, possessed
CPChem's trade-secret information without restriction and were free to publicly
disclose it. INEOS asserted that the expiration of these clauses destroyed the trade
secret status of CPChem's technology. 

 CPChem responded that it had always been vigilant in maintaining the secrecy
of its loop slurry technology. With respect to the agreements cited by INEOS,
CPChem offered countervailing evidence to show that, under the unique
circumstances of each, the secrecy of its technology remained intact, despite the
expiration of the secrecy clauses. 

 We now turn to the record evidence regarding this issue. 

 At the temporary injunction hearing, INEOS introduced a number of
agreements between Phillips and Japanese companies, Showa Denko and Showa
Yuka. In 1956 and 1973, Phillips entered into licensing agreements with Showa
Denko. Also in 1973, Phillips signed another licensing agreement with Showa Yuka;
that agreement was later assigned to Showa Denko. All three licenses contained
perpetual secrecy clauses. 

 In 1979, Showa Denko planned to sell one of its plants to another company,
Tonen. Phillips agreed that Showa Denko could sublicense the technology it had
obtained from Phillips under the earlier licenses. Phillips and Showa Denko signed
an agreement in December 1979 permitting Showa Denko to sublicense Phillips's
technology to Tonen. 

 The agreement included the following provision addressing the issue of
secrecy: "[Showa Denko] agrees to bind Tonen to secrecy with an agreement having
a term of fifteen (15) years from the date of sale of the Kawasaki plant." The
December 1979 agreement also required Showa Denko to pay Phillips $1.5 million 
for the right to grant the sublicense to Tonen. 

 INEOS asserts that Showa Denko paid $1.5 million to Phillips specifically for
the shortened secrecy term. INEOS cites the testimony of one of CPChem's
witnesses, Randy Lee Hagenson, CPChem's Manager of Polyethylene Licensing,
which supports this interpretation of the December 1979 agreement. (4) INEOS relies
on this interpretation of the agreement to support its argument that Phillips did not
protect the secrecy of its technology. INEOS intimates that accepting the $1.5 million
dollars in exchange for the shortened term is significant evidence because it shows
an affirmative act with respect to the loss of secrecy, rather than a mere failure to act
to protect it. However, such interpretation of the agreement between Phillips and
Showa Denko is not supported by the express terms of the written agreement. 

 The December 1979 agreement between Showa Denko and Phillips did not
specifically provide that Showa Denko was required to pay Phillips $1.5 million in
exchange for a shortened secrecy requirement. Although the shortened secrecy
requirement may have influenced the sum paid, the plain language of the agreement
indicates that Showa Denko paid $1.5 million to Phillips in exchange for the right to
grant a sublicense to Tonen. No mention is made in the agreement that the funds
were paid specifically for the shortened secrecy requirement. 

 At the injunction hearing, CPChem proffered the testimony of Randy Lee
Hagenson, who testified that he is responsible for licensing the loop slurry process. 
He described his job responsibilities as "respond[ing] to licensing opportunities
around the world," "writ[ing] licenses for new opportunities," and "support[ing]
existing licenses through various programs we have." 

 CPChem offered Hagenson's testimony to show that any trade-secret
information that may have been transferred to Tonen had remained confidential,
despite the expiration of the Tonen secrecy clause in 1994. Hagenson testified that
Tonen, Showa Denko, and Showa Yuka are now all owned by Japan Polyethylene,
which is bound by the perpetual confidentiality provision in the 1956 Showa Denko
licensing agreement. Although it is undisputed that Tonen was acquired by Japan
Polyethylene at some point after the secrecy clause expired in 1994, CPChem's
evidence showed that it was unaware that any of its trade secrets had been publically
disclosed as a result of the expiration of any fixed-term secrecy clause. This would
necessarily include the Tonen agreement. 

 In his testimony, Hagenson also provided an example of how CPChem had
acted to guard its technical information in the hands of the Japanese companies.
Hagenson testified that, when it learned that Showa Denko had sought to license the
loop slurry technology to a another third-party, CPChem contacted Showa Denko to
object. Showa Denko then assured CPChem that it would not attempt to license the
technology in the future. 

 INEOS also offered agreements pertaining to the construction of a polyethylene
plant in Basrah, Iraq. The first is a licensing agreement between Phillips and the Iraqi
government's Ministry of Industry and Minerals ("the Ministry"), signed in 1976. 
This agreement had a 25-year secrecy clause. 

 With regard to the agreement, Hagenson testified that, the force majeure
provision had been triggered due to war and civil unrest in Iraq, putting the agreement
in "abeyance." Hagenson indicated that, because of the force majeure, it was
CPChem's position that the "clock never started ticking" on the agreement; thus, the
25-year time period for the secrecy clause never began to run. 

 Hagenson also testified that, before the Iraqi polyethylene plant was built,
Phillips and the Ministry entered into a new licensing agreement in 1988. (5) This
agreement contained a perpetual secrecy provision. 

 INEOS also introduced another agreement from 1976 relating to the
construction of the Basrah plant. The Ministry had chosen contractors Lummus and
Thyssen to construct the plant. To facilitate construction, Phillips signed an
agreement with Lummus and Thyssen to govern the disclosure of Phillips's
technology to the contractors. The agreement had a 25-year secrecy provision. 

 With respect to the contractors, Hagenson testified that, by 1988, when the
second agreement was signed containing the perpetual secrecy provision, Thyssen
was no longer a contractor on the Basrah project, only Lummus remained. Hagenson
testified that, by 1988, Thyssen "was out of the business" of contracting. 

 With respect to Lummus. Hagenson testified that CPChem has had many
business dealings with the company since the Basrah project. In these dealings,
Lummus has signed perpetual secrecy agreements with regard to the CPChem's loop
slurry technology. Hagenson testified that Lummus has never built a loop slurry plant
without CPChem's permission. And Hagenson has "never heard Lummus claim they
got anything from [the] Iraq project," with respect to CPChem's technology.

 INEOS also points to another document relating to the construction of the
Basrah plant. INEOS introduced a form entitled "Secrecy Agreement," which
Phillips had forwarded to Lummus in 1978. Under the Secrecy Agreement, a
subcontractor was required to keep Phillips's confidential information secret for 25
years. Phillips requested that Lummus's subcontractors sign the agreement before
receiving Phillips's confidential information on the Basrah project. However, INEOS
did not introduce any agreements actually signed by a subcontractor or offer any
evidence regarding which, if any, subcontractors had received Phillips's trade secrets.

 Lastly, INEOS offered another licensing agreement that had a limited term
confidentiality provision. In 1976, Phillips signed a licensing agreement with the
Norwegian company, Norpolefin. The agreement had a 25-year secrecy clause, which
expired in 2001. 

 CPChem introduced evidence to show that it had taken corrective action to
prevent disclosure of its technology under the Norpolefin agreement. In 2003,
CPChem renegotiated the agreement with Norpolefin's successor, Borealis. Under
the new agreement, the secrecy provision was extended by 50 years. The parties also
agreed that the new secrecy provision would be retroactive. In addition, Borealis
warranted that it had not disclosed any of CPChem's confidential information. 

 On appeal, INEOS's briefing focuses on the expired secrecy clauses. As it did
at the hearing, INEOS posits that once the secrecy provisions in the various
agreements expired, CPChem's loop slurry technology lost trade secret status. 
INEOS asserts that the expired confidentiality provisions demonstrate a lack of
vigilance by CPChem to guard the secrecy of its information. INEOS contends that
such lack of vigilance is fatal to preserving a trade secret right. INEOS argues that,
as a result, CPChem has not demonstrated a probable right of relief necessary to
support a temporary injunction. 

 In its brief, INEOS accurately recites the legal principles on which it bases its
position. We summarize these principles as follows:


 A trade secret must be a secret. See Luccous v. J.C. Kinley Co., 376 S.W.2d
336, 338 (Tex. 1964) ("It is self-evident that the subject matter of a trade secret
must be kept secret."); Astoria Indus. of Iowa, Inc. v. SNF, Inc., 223 S.W.3d
616, 634 (Tex. App.--Fort Worth 2007, pet. denied) ("Before information can
be termed a trade secret, there must be a substantial element of secrecy.");
Gonzales v. Zamora, 791 S.W.2d 258, 264 (Tex. App.--Corpus Christi 1990,
no writ) ("[T]he key part of the definition of trade secret is secrecy."). 

 Vigilance in guarding the trade secret is required because, once the
information is publically revealed through the owner's lack of vigilance,
it is no longer a trade secret; the element of secrecy is gone. See Computer
Assoc. Int'l, Inc. v. Altai, Inc., 918 S.W.2d 453, 457 (Tex. 1996) ("Vigilance
in the area of trade secrets is required, particularly because once a trade secret
is made public all ownership is lost."); T-N-T Motorsports, Inc. v. Hennessey
Motorsports, Inc., 965 S.W.2d 18, 22 (Tex. App.--Houston [1st Dist.] 1998,
pet. dism'd) ("Courts have refused to give trade secret protection when the
material or procedure sought to be protected has been publicly disclosed."); see
also Interox America v. PPG Indus., Inc., 736 F.2d 194, 202 (5th Cir. 1984)
(concluding that one who voluntarily discloses information or fails to take
reasonable precautions to insure its secrecy cannot claim that information
constituted trade secret). 

 A trade secret owner may disclose trade secret information to a third
party without risk of losing trade secret protection if the owner takes steps
to insure the secrecy of the information. See Furr's Inc. v. United Specialty
Advertising Co., 385 S.W.2d 456, 459 (Tex. Civ. App.--El Paso 1964, writ
ref'd n.r.e.) ("The owner of the secret must do something to protect himself. 
He will lose his secret by its disclosure unless it is done in some manner by
which he creates a duty and places it on the other party not to further disclose
or use it in violation of that duty.").

 Courts have held that the unrestricted disclosure of trade-secret
information to third parties, outside the context of a confidential
relationship, destroys the trade-secret status of the information. See, e.g.,
Numed, Inc. v. McNutt, 724 S.W.2d 432, 435 (Tex. App.--Fort Worth 1987,
no writ) (concluding that data not trade secret because owner had previously
disclosed it in contracts to its customers); Interox America, 736 F.2d at 202
(considering owner's past conduct of voluntarily giving third-party contractors
manuals containing technical information to support conclusion that
information not entitled to trade secret protection).


 Although urged by INEOS, we may not apply these legal principles in this
interlocutory appeal to determine whether CPChem's loop slurry technology is a trade
secret. (6) See Davis, 571 S.W.2d at 861; see also Sharma v. Vinmar Int'l, Ltd., 231
S.W.3d 405, 423-24 (Tex. App.--Houston [14th Dist.] 2007, no pet.). We also do
not assume that the trial court made this determination. To the contrary, when
deciding whether to grant trade-secret protection through a temporary injunction, a
trial court does not determine whether the information sought to be protected is, in
law and fact, a trade secret; rather, the trial court determines whether the applicant has
established that the information is entitled to trade secret protection pending the trial
on the merits. See Sharma, 231 S.W.3d at 424; IAC, Ltd., 160 S.W.3d at 197. 

 On appeal, the dispute is whether CPChem showed a probable right to the relief
sought on its misappropriation of trade secrets claim, a necessary showing for it to
obtain a temporary injunction. To show a probable right of recovery, as it relates to

the trade secret element of its claim, CPChem was required to present some evidence
in the trial court tending to show that it possessed a trade secret. See Camp, 348
S.W.2d at 519. The more specific dispute on appeal, as defined by INEOS's briefing,
is whether CPChem presented some evidence tending to show that it was sufficiently
vigilant in guarding the secrecy of its loop slurry technology. See id. By issuing the
temporary injunction, the trial court implicitly determined that CPChem made this
showing. We must determine whether the trial court abused its discretion in reaching
this conclusion. 

 At the center of the vigilance dispute are the expired secrecy clauses relied on
by INEOS. CPChem presented evidence from which a reasonable inference could
have been drawn that CPChem took steps to preserve the secrecy of its technology. 
CPChem presented evidence that it secured perpetual secrecy agreements from
Lummus and obtained a 50-year secrecy agreement with Borealis. CPChem also
warned Showa Denko not to disclose the loop slurry technology when Showa Denko
appeared to be contemplating licensing the technology to a third party.

 In addition, CPChem presented evidence indicating that it was justified in
taking no action with respect to some of the expired secrecy provisions. In this
regard, the evidence showed that any threat of disclosure or unauthorized use of
CPChem's trade secrets had already been neutralized by other circumstances. 

 CPChem's evidence showed that it believed the 1976 agreement with the
Ministry of Iraq, containing the 25-year secrecy clause, was held in abeyance due to
force majuere. For this reason, CPChem introduced testimony indicating that the
company believed that the time period on the secrecy provision was never triggered. 
CPChem also showed that it signed a new agreement with the Ministry in 1988
containing a perpetual secrecy provision. 

 CPChem also offered evidence demonstrating that it had reason to believe that
any threat posed by the proposed 15-year secrecy clause in the proposed Tonen
sublicense had been neutralized. Tonen is owned by Japanese Polyethylene, which
owes a perpetual secrecy obligation to CPChem. 

 With regard to the remaining agreements cited by INEOS, no evidence was
presented to show that CPChem's trade secrets had been disclosed to the contracting
party. Specifically, no evidence showed that Thyssen came into possession of
CPChem's technology while the original Iraqi agreement was in abeyance, and before
Thyssen went out of the contracting business. No evidence was presented to show
which, if any, subcontractors on the Basrah project received CPChem's trade secrets
or which, if any, signed the fixed-term secrecy form introduced by INEOS. 

 In addition, CPChem introduced testimony that it is unaware that any of the
expired secrecy obligations cited by INEOS has resulted in the unauthorized public
disclosure of its trade secrets. INEOS presented no evidence to the contrary. It is
also undisputed that the vast majority of the licenses given by Phillips and CPChem
over the past 50 years contain perpetual secrecy clauses. It is also noteworthy that
CPChem introduced evidence detailing the strict security measures it has
implemented and maintained over the years to keep its loop slurry technology
confidential, aside from the secrecy agreements. 

 When an effort is made to keep material important to a particular business from
competitors, trade secret protection is warranted. (7) See Rugen v. Interactive Bus. Sys.,
Inc., 864 S.W.2d 548, 552 (Tex. App.--Dallas 1993, no writ); Gonzales v. Zamora,
791 S.W.2d 258, 265 (Tex. App.--Corpus Christi 1990, no writ). After viewing the
evidence submitted to the trial court in the light most favorable to the court's ruling,
drawing all legitimate inferences from the evidence, and deferring to the trial court's
resolution of conflicting evidence, we conclude that CPChem presented some
evidence tending to show that it acted with vigilance to maintain the secrecy of its
trade secrets. (8) The trial court reasonably determined that (1) CPChem demonstrated
a probable right to the relief sought and (2) CPChem's loop slurry technology is
entitled to trade secret protection pending trial on the merits. We hold that the trial
court properly exercised its discretion in granting the temporary injunction. (9)

 We overrule INEOS's sole issue.

 Conclusion


 We affirm the trial court's order granting the temporary injunction. 





 Laura Carter Higley

 Justice


Panel consists of Justices Jennings, Higley, and Sharp.
1. INEOS Group Ltd., INEOS Technologies, INEOS Americas LLC, INEOS
Manufacturing Belgium NV, INEOS LLC INEOS Europe Limited, INEOS
Polyethylene North America, INEOS USA LLC, and INEOS Olefins, LP are
defendants in the trial court and appellants on appeal. We refer to the companies
collectively as INEOS.
2. A party may appeal from an interlocutory order of a district court that grants or denies
a temporary injunction. See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4)
(Vernon 2008).
3. At the hearing, CPChem cited seven examples of its trade secrets relating to its loop
slurry process that INEOS is disclosing in its licensing packages.
4. We are reminded that, when the meaning of a contract is plain and unambiguous, a
witness's interpretation of the contract is immaterial. See Sun Oil Co. v. Madeley, 626
S.W.2d 726, 732 (Tex. 1981); Nowlin v. Frost Nat'l Bank, 908 S.W.2d 283, 286 (Tex.
App.--Houston [1st Dist.] 1995, no writ) (explaining that in absence of finding of
ambiguity, affidavit stating meaning of contractual language is "irrelevant"). 
5. INEOS points out that at the hearing it objected to Hagenson's testimony regarding
the 1988 agreement based on the best evidence rule. However, the record shows that
Hagenson had testified regarding the 1988 agreement and its perpetual confidentiality
provision earlier in the hearing without objection. 
6. INEOS asserts that the trial court abused its discretion in granting the temporary
injunction because it misapplied the law to the established facts. See State v. Sw. Bell
Tel. Co., 526 S.W.2d 526, 528 (Tex. 1975). INEOS argues that CPChem lost its trade
secret as a matter of law. INEOS asserts that the underlying facts are established
because it is undisputed that the cited secrecy clauses have expired. INEOS is only
partly correct. While some of the facts may be characterized as established, many of
the facts relevant to determining the questions of vigilance and secrecy are not. This
is demonstrated by CPChem's countervailing evidence offered with regard to the
expired secrecy clauses, as discussed herein.
7. At oral argument, INEOS relied heavily on Purnell v. Thyssen Industrie AG Henschel
for the proposition that CPChem's trade secrets were destroyed when the secrecy
clauses expired. No. 01-95-00125-CV, 1995 WL 622919, *5 (Tex. Civ.
App.--Houston [1st Dist.] 1995, no writ) (not designated for publication). In Purnell,
the trial court had granted a temporary injunction to protect the plaintiff's trade secrets
pending trial. Id. at *2-3. This Court reversed the trial court's order because the
evidence showed that the plaintiff had failed to maintain the secrecy of its trade
secrets by disclosing the information freely and without restriction to one of the
defendants over the course of many years. Id. at *5. The plaintiff also never told the
defendant that the information was confidential until it asked the defendant to sign a
confidentiality agreement. Id. After the defendant refused to sign the confidentiality
agreement, the plaintiff continued to give the defendant the information without any
restrictions. Id. Such facts are absent in this case. Similarly, the pivotal facts argued
by INEOS as destroying the secrecy of CPChem's trade secrets are absent in Purnell. 
The defendants in Purnell did not rely on an expired secrecy clause in a contract with
a non-party to demonstrate a lack of trade secret. Moreover, the plaintiff in Purnell
introduced minimal, if any, evidence to show any measures it had taken to maintain
the secrecy of its information. The factual differences between Purnell and this case
compel us to conclude that Purnell is not controlling in this fact-intensive case. 
8. In its brief, INEOS asserts, "Other jurisdictions agree that the expiration of such
secrecy provisions kills the secret." INEOS cites two federal cases from
Massachusetts, DB Riley, Inc. v. AB Engineering Corp., 977 F.Supp. 84, 91 (D. Mass.
1997) and Baystate Technologies, Inc. v. Bentley Systems, Inc., 946 F.Supp. 1079,
1093 (D. Mass. 1996), and one state court opinion from Wisconsin, ECT
International, Inc. v. Zwerlein, 597 N.W.2d 479, 484-85 (Wis. App. 1999). These
cases are inapposite to instant one. In Zwerlein, the defendant, who sought to utilize
the trade secret information, was the same party who had the limited-term secrecy
agreement with the trade secret owner. 597 N.W.2d at 484-85. The defendant was
not relying on an expired secrecy clause in a third-party agreement, as INEOS does
here. See id. In both DB Riley and Baystate Technologies, other significant evidence
was introduced, besides the expired secrecy agreements, to show that the trade secret
owner had been less than vigilant in maintaining the secrecy of its information. See
DB Riley, 977 F.Supp. at 91; Baystate Tech., 946 F.Supp. at 1092-93. Here, INEOS
relies entirely on the expired secrecy agreements with third-parties to show that
CPChem lacked vigilance in maintaining its trade secrets. Moreover, the type of
countervailing evidence offered by CPChem in this interlocutory matter appears to
have been lacking in the cited cases.
9. By our decision today in this interlocutory appeal, we do not decide, nor do we imply,
that CPChem will ultimately prevail on its claims.